HAEGGQUIST & ECK, LLP
ALREEN HAEGGQUIST (221858)
  alreenh@haelaw.com
AARON M. OLSEN (259923)
  aarono@haelaw.com
ANNA C. SCHWARTZ (346268)
  annas@haelaw.com
225 Broadway, Suite 2050
San Diego, CA  92101
Telephone: (619) 342-8000
Facsimile: (619) 342-7878

Attorneys for Plaintiff Jennifer Crumley

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JENNIFER CRUMLEY, an Individual,<br><br>          Plaintiff,<br><br>     v.<br><br>SECURITYSCORECARD, INC., a<br>New York Corporation,<br><br>          Defendant. | Case No.: **'24CV2037 BEN AHG**<br><br>COMPLAINT FOR DAMAGES AND OTHER RELIEF<br><br><br><br><br><br>DEMAND FOR JURY TRIAL |

Plaintiff Jennifer Crumley ("Ms. Crumley" or "Plaintiff"), by her attorneys, brings this action on behalf of herself against Defendant SecurityScorecard, Inc. ("SecurityScorecard" or "Defendant"). Ms. Crumley makes the following allegations upon information and belief (except those allegations as to Ms. Crumley or her attorneys which are based on personal knowledge), based upon an investigation that is reasonable under the circumstances, which allegations are likely to have evidentiary support after a reasonable opportunity for further investigation and/or discovery.

## NATURE OF THE ACTION

1.      Jennifer Crumley is an experienced and successful sales professional. For over 20 years, Ms. Crumley excelled in various high technology sales roles before she was poached from her Vice President of Sales position by SecurityScorecard – a cybersecurity startup. During her four years at SecurityScorecard, while enduring a stereotypical "boys club," Ms. Crumley routinely excelled as the highest performing sales representative for SecurityScorecard's busiest region—the West Coast.

2.      In May 2021, Ms. Crumley procured SecurityScorecard's largest-ever sales commitment for cybersecurity services with Southern California Edison ("SCE"). Over the next two and a half years, Ms. Crumley worked tirelessly to push the SCE deal towards closing, completing all steps required of her under SecurityScorecard's sales commission plan and earning her a record-breaking six-figure commission. Sadly, in October 2023, after Ms. Crumley had completed all material tasks on her part, as the deal was being finalized by the company's legal department for signing, SecurityScorecard unlawfully fired Ms. Crumley to intentionally deprive her of the largest sales commission the company had ever seen. Immediately after her termination, the company handed over her record-breaking sales commission and her West Coast sales territory to a younger, male sales employee who was an upcoming member of the boys' club.

3.      Worse, in addition to discriminating against and unlawfully discharging Ms. Crumley, SecurityScorecard subjected Ms. Crumley to employment agreements

containing illegal choice of law and non-compete provisions to which it subjects all its employees.

4.      To redress the harms suffered, Ms. Crumley brings claims for: (1) violation of Labor Code §925 and a declaration of rights; (2) violation of Business and Professions Code §16600.5; (3) breach of implied covenant of good faith and fair dealing; (4) declaratory relief, Code of Civil Procedure §1060; (5) wrongful termination in violation of public policy; (6) gender discrimination in violation of Government Code §12940(a); (7) gender pay discrimination in violation of Labor Code §1197.5(a); (8) failure to timely pay all wages due and owing in violation of Labor Code §218; and (9) unlawful and unfair competition in violation of California Business and Professions Code §17200, *et seq*.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this action under 28 U.S.C. §1332(a)(1) because the parties are citizens of different states and the amount in controversy exceeds $75,000.00, excluding interest and costs.

6.      The Southern District of California has personal jurisdiction over the parties in this matter. Plaintiff is, and at all relevant times was, a citizen of the County of San Diego, State of California. Defendant either has, or currently does, business within California, operates in California, and has a location in San Diego, California, where Plaintiff was employed. Defendant is either licensed to do, or does, business in California, has employees who reside in California, and promotes, sells, and markets services to customers throughout California. Finally, the acts and omissions which are outlined in this Complaint took place within the County of San Diego, State of California.

7.      Venue is proper in this District under 28 U.S.C. §1391 because Plaintiff and Defendant are, and at all relevant times have been, subject to the personal jurisdiction of this Court, and because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

HAEGGQUIST & ECK, LLP

# THE PARTIES

## Plaintiff

8.    Jennifer Crumley is a natural person, over 18 years old, residing in the County of San Diego, State of California. Ms. Crumley was an employee of SecurityScorecard from January 6, 2020, until her termination on October 11, 2023.

## Defendant

9.    SecurityScorecard, Inc. is a privately held corporation. Upon information and belief, SecurityScorecard operated during Plaintiff's employment in the State of California as a foreign corporation, with its principal place of business located at 1140 Avenue of the Americas, 19th Floor, New York, New York 10036.

10.    In doing the acts alleged herein, Defendant's employees, subcontractors, and agents acted within the course and scope of their employment and agency with Defendant. Defendant engaged in the acts alleged herein and/or condoned, permitted, authorized, and/or ratified the conduct of its employees, subcontractors, and agents, and is vicariously liable for the wrongful conduct of their employees, subcontractors, and agents alleged herein.

# EXHAUSTION OF REMEDIES

11.    On October 28, 2024, Ms. Crumley filed a charge of discrimination with the California Civil Rights Department ("CRD") against SecurityScorecard. That same day, the CRD closed Ms. Crumley's case against SecurityScorecard and issued a Right-to-Sue letter. *See* Exhibit 1 attached hereto. Therefore, Ms. Crumley has exhausted her administrative remedies.

# FACTS COMMON TO ALL COUNTS

## About SecurityScorecard

12.    SecurityScorecard, founded in 2014 by Sam Kassoumeh and Aleksandr Yampolsky, is a cybersecurity startup company that offers a security ratings technology to organizations for enterprise risk management, third-party risk

COMPLAINT FOR DAMAGES AND OTHER RELIEF

HAEGGQUIST & ECK, LLP

management, board reporting, due diligence, cyber insurance underwriting, and regulatory oversight.

13.    The cybersecurity industry continues to be heavily male-dominated, and SecurityScorecard's makeup is no different, particularly in the sales department.

### Ms. Crumley's Employment

14.    Ms. Crumley has been in sales for 25 years. She earned her Bachelor of Science in Business and High Technology Management and a Master's degree, which allowed her to break into and thrive in a technical sales environment. Following her degrees, Ms. Crumley predominantly worked in software sales, a highly technical, yet people-facing position. By 2017, Ms. Crumley had worked her way up to Vice President of Sales for the cybersecurity company VIP Cyber Defense.

15.    SecurityScorecard was a startup cybersecurity company and a client of VIP Cyber Defense. SecurityScorecard began heavily recruiting Ms. Crumley with promises of a higher salary and the opportunity to earn substantial commissions. Based on SecurityScorecard's representations, Ms. Crumley left her position as Vice President of Sales at VIP Cyber Defense in January 2020 and joined SecurityScorecard.

16.    Ms. Crumley was hired by SecurityScorecard effective January 6, 2020, as the Field Sales Director, Southern California Region. As a regional sales director, Ms. Crumley was responsible for securing new client acquisitions and renewals and upselling existing clients. She was assigned to the Western Division, which included sales and renewals in Southern California (San Diego, Orange County, and Los Angeles), Nevada (Las Vegas), Arizona, and Hawaii. Her starting annual salary was $175,000, with a commission "targeted at $150,000" if she achieved 100% of her plan, and, subject to approval by the Board of Directors, 10,000 in options to purchase common stock at the fair market value.

17.    With respect to her commission earnings, SecurityScorecard had Ms. Crumley enter non-negotiable Variable Compensation Plans each year, including (a)

HAEGGQUIST & ECK, LLP

Variable Compensation Plan FY 2020, (b) Variable Compensation Plan FY 2021; (c) Variable Compensation Plan FY 2022; and (d) Variable Compensation Plan FY 2023 (collectively, the "Compensation Plans"). The Compensation Plans were implemented to govern Ms. Crumley's commission compensation earned from her sales activity. Unfortunately, as discussed below, the Compensation Plans contained unconscionable and unlawful provisions, and SecurityScorecard acted in bad faith to frustrate the benefits and purpose of the Compensation Plans to unlawfully cheat Ms. Crumley out of hundreds of thousands of dollars in commissions.

18.    Pursuant to the Compensation Plans, Ms. Crumley was eligible to earn "Variable Compensation," defined as "additional compensation, above Base Salary, that a Participant is eligible to earn based upon Bookings recording in the Salesforce system."[1] A "Booking" was defined as a "contract accepted by the Company and the customer for the usage of Company services as defined by the following criteria": (a) valid end user SaaS Agreement (signed or accepted digitally) or similar legal agreement; (b) a customer or reseller purchase order (or exception letter); (c) be marked closed-won in Salesforce; and (d) no opt out clauses or other cancellation rights requiring a refund, and, if such clauses were allowed, when all contingencies have expired. According to her 2023 compensation plan, for new clients with annual recurring revenue, Ms. Crumley would receive a commission of 8.65% of revenue, plus eligibility for accelerated commission based on hitting certain thresholds, among other incentive eligibility.

19.    Based on the promise to earn substantial commissions, Ms. Crumley worked extremely hard to procure Bookings, which she did exceptionally well. To obtain a customer purchase order, Ms. Crumley had to do extensive work, from

_____

[1]    The Variable Compensation was a "commission" under California law. *See* Cal. Lab. Code §§2751(c), 200, 204.1 ("Commission wages are compensation paid to any person for services rendered in the sale of such employer's property or services and based proportionately upon the amount or value thereof.").

HAEGGQUIST & ECK, LLP

researching and sourcing new clients and conducting industry-relevant research, to establishing, developing, and nurturing the connection with prospective clients to gain an understanding of their cybersecurity needs.

20.     Throughout her employment, Ms. Crumley excelled as a Regional Sales Director—closing major deals and receiving merit increases, with the most recent increase on April 1, 2022, bringing Ms. Crumley to a base salary of $206,000. She was twice named the Top Representative of the West, in 2020 and 2021, and honored with glass trophies.

 

21.     Sadly, Ms. Crumley's success did not come without discriminatory hurdles. SecurityScorecard's management team favored its young, male employees and discriminatorily rewarded its male employees with opportunities not provided to Ms. Crumley.

22.     Ms. Crumley was one of the first women hired as a Regional Field Sales Director at SecurityScorecard. In 2021, her then boss, Rich Murphey, hired his male friend while Ms. Crumley was on paid time off and split Ms. Crumley's sales territory with the new hire even though the territory did not need another Sales Director. When Ms. Crumley returned to work and questioned why, Mr. Murphey yelled (aka "mansplained") at Ms. Crumley that he could do whatever he wanted. This treatment

HAEGGQUIST & ECK, LLP

toward Ms. Crumley would not have occurred had she been a male. Ms. Crumley reported the mistreatment to human resources.

23.     Further evidencing the systemic discriminatory environment, in 2022, SecurityScorecard's CEO met with a company officer before a meeting between that officer and Ms. Crumley. The officer divulged to Ms. Crumley that one of the CEO's goals was to "have a threesome with an Asian woman."

24.     In addition, in 2022 and 2023, SecurityScorecard cut Ms. Crumley's Western Sales Territory and handed over Arizona opportunities to a male employee, Scott Otero, removed any pending deals from Ms. Crumley's oversight to give to a younger male employee, and promoted a more junior male employee to a manger role above Ms. Crumley. The actions were not based on legitimate or bona fide non-discriminatory factors.

25.     Moreover, in May 2023, Ms. Crumley's territory in Las Vegas was transferred to another rep out of New York named Andrew Wallach who was best friends with Alex Rich, the VP of Sales East, and was favored by Senior VP of Sales for the Americas, Rich Wenning. Mr. Wallach, a male believed to have been in his late twenties, fit right in with the boys' club and immediately received favorable treatment from SecurityScorecard's all-male leadership team, despite being less experienced than Ms. Crumley. Many of her accounts, and related opportunities and commissions, were handed over to Mr. Wallach. At the time her territory was slashed, Ms. Crumley had many large deals in the pipeline and readying to close.

26.     Sadly, as set forth below, the ultimate act of discrimination and bad faith by SecurityScorecard occurred after Ms. Crumley procured the company's largest ever deal with SCE.

**SecurityScorecard Unlawfully Discharges Ms. Crumley**

27.     In May 2021, Ms. Crumley engaged a new client, SCE, who Ms. Crumley caused to develop interest in a massive cybersecurity service contract with SecurityScorecard. The contract alone ended up being worth over $4 million dollars,

HAEGGQUIST & ECK, LLP

COMPLAINT FOR DAMAGES AND OTHER RELIEF

making it SecurityScorecard's largest deal and setting Ms. Crumley up for a record-setting commission that would exceed $450,000.

28.    Procuring the contract did not come easy, requiring two and half years of work by Ms. Crumley to procure the deal. She had regular meetings with SCE staff members, performed several product demonstrations, and worked through SCE's concerns, resulting in a purchase order and commitment by SCE. After the deal had been procured by Ms. Crumley, the final step was for the company's legal department to finalize the written agreement for signatures as required by company policy. Ms. Crumley had completed all material duties. Indeed, the company was already publicly celebrating the deal around the office, with colleagues circulating excited congratulatory slack messages and the in-house attorneys telling Ms. Crumley they were going to send her a huge bottle of champagne to celebrate.

29.    Unfortunately, while champagne would be forthcoming, it would not be for Ms. Crumley. Instead, without warning, while legal was working out the final terms in the paperwork that would be finalized in just a few weeks, on October 11, 2023, SecurityScorecard unlawfully discharged Ms. Crumley to avoid paying her the record-breaking commission. Instead, with the contract being signed just weeks later, Mr. Wenning discriminatorily handed the more than $450,000 in commission to the newest member of his boys' club, Mr. Wallach, on a golden platter, violating long-held law that "'"[h]e who shakes the tree is the one to gather the fruit."'" *Schachter v. Citigroup, Inc.*, 47 Cal. 4th 610, 622 (2009) (citations omitted) (citing *Willson v. Turner Resilient Floors*, 89 Cal. App. 2d 589, 595-96 (1949)). Sadly, at SecurityScorecard when it's "***she***" who shakes the tree, it's "***he***" who gets the fruit. Mr. Wallach, a newer member of the boys' club, received over $450,000 in commission despite performing no substantive work in procuring the deal, while Ms. Crumley, who did over two and a half years of work to procure the deal, received nothing.

HAEGGQUIST & ECK, LLP

30.     SecurityScorecard's termination and unequal pay were discriminatory and made in bad faith to avoid paying Ms. Crumley over $450,000 in commissions. Ms. Crumley did not have any legitimate performance issues and there was otherwise no good cause for her termination, but for cheating her out of substantial commissions. A male employee in her position would not have been treated in such an adverse manner. Rather, Mr. Wenning used false and pretextual reasons to intentionally interfere with Ms. Crumley's Compensation Plan.

31.     To add insult to injury, as set forth below, SecurityScorecard subjected Ms. Crumley to several unlawful and unconscionable terms in the one-sided contracts it forced her to sign as a condition of employment.

### SecurityScorecard Requires Employees to Agree to Unlawful and Unconscionable Contracts as a Condition of Employment

32.     First, in addition to the Compensation Plans, SecurityScorecard required Ms. Crumley and other employees to enter an agreement called, Employee's Proprietary Information and Inventions and Non-Competition Agreement ("Noncompete Agreement"). Both the Compensation Plans and Noncompete Agreement contain unlawful choice of law and venue provisions that violate California Labor Code §925.

33.     Second, the Noncompete Agreement contains unlawful noncompete provisions in violation of well-settled law. *Edwards v. Arthur Andersen LLP*, 44 Cal. 4th 937, 946 (2008); *AMN Healthcare, Inc. v. Aya Healthcare Servs., Inc.*, 28 Cal. App. 5th 923, 936 (2018); *Brown v. TGS Mgmt. Co., LLC*, 57 Cal. App. 5th 303, 318-19 (2020); Cal. Bus. & Prof. Code §16600(a).

34.     Third, the Compensation Plans expressly denied timely payment of commissions in violation of California law. Under California law, "sales commissions are considered 'wages.'" *Sciborski v. Pac. Bell Directory*, 205 Cal. App. 4th 1152, 1166 (2012); Cal. Lab. Code §200. As such, they are due and payable twice during each calendar month on regular paydays, not the next month (or later) based on the

company's best effort. Cal. Lab. Code §204(a). However, in violation of Labor Code §204(a), SecurityScorecard fails to pay earned commission until the last day of the month following the month it was earned. Because of this illegal term, Ms. Crumley and others routinely had to wait unlawful lengths of time to be paid their owed wages. The Labor Code provision regarding the timely payment of wages cannot be "contravened or set aside by a private agreement, whether written, oral, or implied." Cal. Lab. Code §219(a).

35.     Fourth, the Commission Plans contain an unconscionable forfeiture provision that SecurityScorecard used to try to cheat paying Ms. Crumley substantial commissions for a client she procured for SecurityScorecard. *See Ellis v. McKinnon Broad. Co.*, 18 Cal. App. 4th 1796, 1807 (1993) (finding such forfeiture provisions are unconscionable).

36.     By knowingly including the unlawful provisions in the agreements, SecurityScorecard also violated California Labor Code §432.5, which prohibits employers from requiring employees to agree to any terms or conditions of employment that are known by the employer to be prohibited by law.

37.     As a direct result of SecurityScorecard's conduct, Ms. Crumley has suffered, and continues to suffer, lost wages, humiliation, embarrassment, emotional distress, and mental anguish. Ms. Crumley is a victim of Defendant's unlawful practices and therefore brings this action to recover damages and declaratory and injunctive relief.

## PRIVATE ATTORNEYS GENERAL ACT

38.     California's PAGA (Labor Code §2698, *et seq.*) was in effect during all relevant times during Ms. Crumley employment with SecurityScorecard. PAGA provides that any civil penalty which may be assessed and collected by the Labor and Workforce Development Agency ("LWDA") for violations of the Labor Code may, as an alternative, be recovered through a civil action brought by an aggrieved

HAEGGQUIST & ECK, LLP

employee on behalf of herself and other current or former employees pursuant to procedures outlined in Labor Code §2699.3.

39.    Under PAGA, an "aggrieved employee," is "any person who was employed by the alleged violator against whom one or more of the alleged violations was committed." Cal. Lab Code §2699(c). Ms. Crumley was employed by SecurityScorecard and the alleged violations were committed against her during her employment and she is, therefore, an aggrieved employee as defined by Labor Code §2699(c).

40.    Under Labor Code §§2699.3 and 2699.5, an aggrieved employee, including Ms. Crumley, may pursue a civil action to recover PAGA civil penalties in addition to any other available penalties after: (1) giving written notice by certified mail ("Employee's Notice") to the LWDA and the employer of the specific provisions of the California Labor Code alleged to have been violated, including the facts and theories to support the alleged violations; and (2) the LWDA advises the employee and employer it declines to investigate the alleged violations within 60 calendar days of the postmark date of the Employee's Notice. Cal. Lab. Code §2699.3(a)(1), (2).

41.    On October 29, 2024, Ms. Crumley provided written notice by online submission and by certified mail to the LWDA and by certified mail to SecurityScorecard of the specific provisions of the Labor Code alleged to have been violated, including the facts and theories to support the alleged violations, under Labor Code §2699.3.

42.    The employer may cure the alleged violation within 33 calendar days of the Employee's Notice. Cal. Lab. Code §2699.3(c)(2)(A). If the alleged violations are not cured within the 33-day period, Ms. Crumley may commence a civil action to recover penalties pursuant to Labor Code §2699.

43.    If the alleged violations are not cured in whole within the 33-day period by SecurityScorecard, Ms. Crumley intends to amend her complaint to add a cause of action arising under Labor Code §2699. *See* Cal. Lab. Code §2699.3(a)(2)(C)

("Notwithstanding any other provision at law, a plaintiff may as a matter of right amend an existing complaint to add a cause of action arising under this part at any time within 60 days of the time periods specified in this part.").

## COUNT I

### Violation of California Labor Code §925 and Declaration of Rights

### (Against Defendant)

44.    Plaintiff realleges and incorporates by reference the allegations contained in the preceding and subsequent paragraphs, as if fully set forth herein.

45.    Section 925 of the Labor Code provides that "[a]n employer shall not require an employee who primarily resides and works in California, as a condition of employment, to agree to a provision that would … (1) [r]equire the employee to adjudicate outside of California a claim arising in California [or] (2) [d]eprive the employee of the substantive protection of California law with respect to a controversy arising in California." Cal. Lab. Code §925(a). It further provides that "[a]ny provision of a contract that violates subdivision (a) is voidable by the employee, and if a provision is rendered void at the request of the employee, the matter shall be adjudicated in California and California law shall govern." Cal. Lab. Code §925(b). Section 925 does not apply if the employee is represented by counsel "in negotiating the terms of an agreement to designate either the venue or forum" nor to any agreement entered into prior to January 1, 2017. Cal. Lab. Code §925(e), (f).

46.    Here, the Noncompete Agreement contains a "Governing Law" provision stating the following: "This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without giving effect to the choice of law provisions thereof." *See* Ex. 2 (Noncompete Agreement), ¶19. Similarly, the Compensation Plans also contain "Governing Law" provisions stating the following:

HAEGGQUIST & ECK, LLP

> This Agreement is governed by the laws of the State of New York, excluding choice of law principles, unless otherwise required by applicable law. Venue shall be New York, NY. Your participation in this Agreement signifies your agreement with all the terms and conditions of the Agreement. In the event this Section is deemed not enforceable by a court of competent jurisdiction in the country in which you reside, the other provisions of this Agreement shall remain in full force and effect.

*See* Ex. 3 at 4 (2023 Compensation Plan).

47.     Plaintiff was not represented by counsel in negotiating the terms of the Noncompete Agreement or Compensation Plans. Plaintiff was required as a condition of employment to agree to the Noncompete Agreement and Compensation Plans that were not subject to negotiation. At all relevant times, Plaintiff resided and worked in California. The Noncompete Agreement was entered on or about December 18, 2019. The Compensation Plans were entered on or about February 7, 2020 and later. As such, all the subject agreements were entered after January 1, 2017, thus mandating compliance with Labor Code §925.

48.     Notwithstanding, Defendant knowingly and intentionally required Plaintiff to enter unlawful choice of law and venue provisions. Based on information and belief, Defendant requires all its California employees who are citizens of California and principally reside and work in California to enter the same invalid choice of law and venue provisions, which are not subject to negotiation. Further, California has a substantial relationship to the parties and Plaintiff's work for Defendant, and mandating that New York law, as opposed to California law, be applied would contravene the fundamental policy of California regarding its citizens who reside and work in California.

49.     As such, Plaintiff requests injunctive relief that renders the unlawful provisions void pursuant to Labor Code §925(b) and (c).

50.     Plaintiff is entitled to recover her reasonable attorneys' fees and costs pursuant to, *inter alia*, Labor Code §925(c).

HAEGGQUIST & ECK, LLP

**COUNT II**

**Violation of California Business and Professions Code §16600.5**
**(Against Defendant)**

51.     Plaintiff realleges and incorporates by reference the allegations contained in the preceding and subsequent paragraphs, as if fully set forth herein.

52.     California has a long-standing public policy favoring open competition and employee mobility, codified in Section 16600 of the Business and Professions Code, which generally voids "every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind." Cal. Bus. & Prof. Code §16600(a). California courts have "consistently affirmed" that Section 16600 "evinces a settled legislative policy in favor of open competition and employee mobility." *Edwards*, 44 Cal. 4th at 946. "The law protects Californians and ensures 'that every citizen shall retain the right to pursue any lawful employment and enterprise of their choice.'" *Id.* (citation omitted). Pursuant to this well-settled law, the following types of restrictive covenants are void and unenforceable as unlawful non-compete clauses:

(a)     Express covenants not to compete. *Edwards*, 44 Cal. 4th at 945.

(b)     Covenants not to solicit a former employer's customers. *Edwards*, 44 Cal. 4th at 948.

(c)     Covenants not to solicit a former employer's employees. *AMN Healthcare*, 28 Cal. App. 5th at 936.

(d)     Overly broad confidentiality provisions that operate as "de facto" noncompete provisions. *Brown*, 57 Cal. App. 5th at 318-19.

53.     California Assembly Bill No. 1076 amended Section 16600 and added Section 16600.1 to the California Business and Professions Code, which became effective on January 1, 2024. Section 16600 now expressly provides that it "shall be read broadly" in accordance with the Supreme Court's opinion in *Edwards v. Arthur Anderson*, which is "not a change in, but is **_declaratory of, existing law_**." Cal. Bus. &

HAEGGQUIST & ECK, LLP

Prof. Code §16600(b) (emphasis added); *see, e.g., Edwards*, 44 Cal. 4th at 948 (broadly holding that, in addition to express non-compete agreements, a customer non-solicitation covenant is an invalid non-compete agreement under §16600).

54.    Unfortunately, Defendant included unlawful restrictive covenant clauses in its Noncompete Agreement that have long been held as unlawful noncompete clauses. Specifically, paragraph 4 of the Noncompete Agreement includes at least two unlawful provisions:

> (a)    <u>Non-Solicitation</u>. I agree that, during the period of my employment and for a period of two (2) years following termination of my employment with the Company for any reason, I will not directly or indirectly (a) solicit or in any manner encourage employees, officers, directors, affiliates or consultants of the Company to end their relationships with the Company; or (b) other than on behalf of the Company, call on, solicit or take away, or attempt to do any of the same, the business of any business partners or other associates of the Company with whom the Company had relationships or with whom I was otherwise acquainted during the term of my employment. . . .

> (b)    <u>Non-Compete</u>. I agree that, during the period of my employment and for a period of two (2) years following the termination of my employment with the Company for any reason, I will not, directly or indirectly, own, manage, operate, control or participate in the ownership, management or control of, or be connected as an officer, employee, partner, director, consultant or otherwise with, or have any financial interest in, or aid or assist anyone else in the conduct of, any entity or business that competes with the Business during my employment and during the period of two (2) years following the termination of my employment) conducted by the Company or any of its subsidiaries or affiliates world-wide, within the United States or within any other area in which the Company conducts its Business on the date that my employment with the Company terminates.

Ex. 2, ¶4.

55.    These broad "Non-Solicitation" and "Non-Compete" provisions, which "shall continue for five (5) years following the termination" of Plaintiff's service with the company (*id.*, ¶15), are not necessary to protect Defendant's legitimate interests

HAEGGQUIST & ECK, LLP

and only work to restrict employee mobility and healthy and open competition. Such provisions are unlawful. *Edwards*, 44 Cal. 4th at 948; *AMN Healthcare*, 28 Cal. App. 5th at 936; Cal. Bus. & Prof. Code §16600. These unlawful clauses have worked to impact Plaintiff's and other employees' ability to work in this competitive industry, where competing companies utilize many of the same vendors and suppliers and compete for the same customers (who are all readily and publicly known by those in the industry). "It shall be unlawful to include a noncompete clause in an employment contract, or to require an employee to enter a noncompete agreement . . . ." Cal. Bus. & Prof. Code §16600.1(a); *see also id.* §16600.5(c) (an employer "shall not enter into a contract with an employee . . . that includes a provision that is void under this chapter"). "Any contract that is void under this chapter is unenforceable regardless of where and when the contract was signed." Cal. Bus. & Prof. Code §16600.5(a).

56.    Making the unlawful Non-Solicitation and Non-Compete clauses even more unconscionable, the "Company" is defined in the Non-Compete Agreement to not only include SecurityScorecard, but also any of its subsidiaries and so-called "affiliates."

57.    Moreover, Section 16600.1 of the Business and Professions Code required Defendant, by February 14, 2024, to notify all current ***and former*** California employees (employed any time after January 1, 2022) who had entered the unlawful Non-Compete Agreements that its violative clauses are void. Cal. Bus. & Prof. Code §16600.1(b)(1). The notice "shall be in the form of a written individualized communication to the employee or former employee, and shall be delivered to the last known address and the email address of the employee or former employee." Cal. Bus. & Prof. Code §16600.1(b)(2). A violation of this section constitutes an act of unfair competition within the meaning of California's Unfair Competition Law, Business and Professions Code §17200. Cal. Bus. & Prof. Code §16600.1(c).

58.    As discussed in this Complaint, Defendant required Plaintiff and all its employees to enter Non-Compete Agreements with unlawful clauses in violation of

HAEGGQUIST & ECK, LLP

Business and Professions Code §§16000, *et seq*. Defendant failed to provide notice by February 14, 2024, to Plaintiff or, on information and belief, any of its other employees in California that the provisions were void.

59.    "An employee, former employee, or prospective employee may bring a private right of action to enforce this chapter for injunctive relief or the recovery of actual damages, or both." Cal. Bus. & Prof. Code §16600.5(e)(1). In addition, "a prevailing employee, former employee, or prospective employee in an action based on a violation of this chapter shall be entitled to recover reasonable attorney's fees and costs." Cal. Bus. & Prof. Code §16600.5(e)(2).

60.    Plaintiff was, and continues to be, harmed by Defendant's unlawful conduct and seeks injunctive relief and recovery of actual damages because of Defendant's misconduct of requiring her to enter a contract that is void, failing to give Plaintiff lawful notice the contract is void, and attempting to enforce a contract that is void. Without injunctive relief, Defendant will continue to try to enforce its void contract on Plaintiff and other California employees, resulting in continued damage and disruption to Plaintiff's and other employees' lawful right to pursue careers outside of SecurityScorecard.

61.    As a proximate result of Defendant's wrongful conduct, Plaintiff has suffered, and continues to suffer, substantial losses in earnings, earning capacity, and other benefits of employment, all in an amount to be determined according to proof at the time of trial. Plaintiff will also suffer tax consequences due to Defendant's failure to pay Plaintiff damages owed, which will come due in a lump sum in the future. Accordingly, Plaintiff is entitled to an additional amount of damages to offset the tax consequences of a lump sum award for lost earnings, plus interest.

62.    As a further proximate result of Defendant's wrongful conduct, Plaintiff has suffered, and continues to suffer, humiliation, embarrassment, loss of enjoyment of life, emotional distress, and mental anguish, all in an amount to be determined according to proof at the time of trial.

63.     In performing the acts alleged, which were committed, authorized, and/or adopted and approved by Defendant's officers, directors, or managing agents, Defendant acted with oppression, fraud, malice, and with conscious disregard for the rights of Plaintiff, and Plaintiff is therefore entitled to punitive damages against Defendant in an amount appropriate to punish and make an example of Defendant.

64.     Plaintiff is also entitled to and seeks attorneys' fees and costs pursuant to California Business and Professions Code §16600.5(e)(2), because of Defendant's wrongful conduct.

## COUNT III

## Breach of Implied Covenant of Good Faith and Fair Dealing

### (Against Defendant)

65.     Plaintiff realleges and incorporates by reference the allegations contained in the preceding and subsequent paragraphs, as if fully set forth herein.

66.     "Every contract contains an implied covenant of good faith and fair dealing providing that no party to the contract will do anything that would deprive another party of the benefits of the contract." *Digerati Holdings, LLC v. Young Money Ent., LLC*, 194 Cal. App. 4th 873, 885 (2011); *Judicial Council of California Civil Jury Instructions* (2024) ("CACI"), No. 325. In other words, "'[w]here a contract confers on one party a discretionary power affecting the rights of the other, a duty is imposed to exercise that discretion in good faith and in accordance with fair dealing.'" *King v. U.S. Bank Nat'l Ass'n*, 53 Cal. App. 5th 675, 706-07 (2020) (citation omitted). "'[T]he [implied] covenant prevents a party from acting in bad faith to frustrate the contract's actual benefits.'" *Id.* (quoting *Guz v. Bechtel Nat'l, Inc.*, 24 Cal. 4th 317, 353 n.18 (2000)). Good faith means honesty of purpose without any intention to mislead or take unfair advantage of another. CACI No. 325. For example, the "covenant might be violated if termination of an at-will employee was a mere pretext

to cheat the worker out of another contract benefit to which the employee was clearly entitled, such as compensation already earned." *King*, 53 Cal. App. 5th at 707.

67.    Under California law, a commission is considered "earned" when the employee has perfected the right to payment by meeting all legal conditions precedent in the contract. However, these conditions are subject to limitations imposed by common law or statute. California's common law has long imposed a limitation on conditions that strip an employee of a right to commissions where she was the procuring cause of the sale by terminating the employee to avoid paying the commission (aka the "Procuring Cause Doctrine"). *Schachter*, 47 Cal. 4th at 622 (she ""who shakes the tree is the one to gather the fruit"") (citations omitted) (citing *Willson*, 89 Cal. App. 2d at 595-96); *see also Wise v. Reeve Elecs., Inc.*, 183 Cal. App. 2d 4 (1960); *Zinn v. Ex-Cell-O Corp.*, 24 Cal. 2d 290, 296 (1944); *Re: Comm'n Calculations*, 2002 Cal. DLSE LEXIS 58 (June 13, 2002) (citing cases). As the California Supreme has found, this doctrine is consistent with contract law principles prohibiting efforts by one party to a contract to prevent completion by the other party. *Schachter*, 47 Cal. 4th at 622. "'If the employee is discharged before completion of all of the terms of the [incentive compensation] agreement, and there is not valid cause, based on conduct of the employee, for the discharge, the employee may be entitled to recover at least a pro-rata share of the promised [incentive compensation]."" *Id.* (citation omitted).

68.    Here, Defendant's actions – not Plaintiff's – resulted in Defendant preventing Plaintiff from receiving the commissions from the record-breaking SCE deal which Plaintiff did all the work to procure. No other material action was required on the part of Plaintiff to complete the sale, which was with the legal department, leading to the commission payment. Defendant intentionally interfered in bad faith to prevent Plaintiff's continued employment at the date of the payout, which was only weeks away. *See Wood v. iGATE Techs., Inc.*, No. C 15-00799 JSW, 2016 U.S. Dist. LEXIS 85658, at *12 (N.D. Cal. June 30, 2016) (if the jury finds "Defendant

20

wrongfully discharged Plaintiff to prevent her from obtaining commission[s]" it supports breach of contract claims); *McCollum v. Xcare.net, Inc.*, 212 F. Supp. 2d 1142, 1152, 1156 (2002) (finding triable issues regarding whether plaintiff was terminated to avoid paying commission on deal that was about two weeks away from closing).

69.    Moreover, the forfeiture provision in the Compensation Plans that states for an employee to receive commission she must be an "active employee" on the date the booking qualifies as earned commission, is unconscionable because it is overly harsh, unreasonable, and unenforceable. *See Ellis*, 18 Cal. App. 4th at 1807; Cal. Civ. Code §1670.5(a). As applied here, consistent with the Procuring Cause Doctrine, the forfeiture provision is both procedurally and substantively unconscionable. Defendant undisputedly occupied superior bargaining power and drafted and required Plaintiff to enter the Compensation Plans as a condition of employment. It is also substantively unconscionable because it conflicts with the definition of what constitutes an "earned" commission in the agreement (aka "Booking" and "Earned Variable Compensation"). The expressly stated definition of what it means to "earn" a commission is not dependent on remaining employed. Further, the result, if applied to the circumstances of this case, would be harsh, one-sided, and grossly unfair. Plaintiff worked for two and a half years to procure the SCE deal, which was simply waiting on the legal department to finalize the paperwork for signing. In bad faith, Defendant unconscionably terminated Plaintiff's employment just weeks before the paperwork was signed. It would be unconscionable to withhold payment of the commission simply because her employment ceased before signing but after she did everything to procure the sale. No other action was required on Plaintiff's part to complete the sale leading to the commission. There was no good cause to terminate Plaintiff's employment.

70.    As a proximate result of Defendant's wrongful conduct, Plaintiff has suffered, and continues to suffer, emotional distress damages and economic losses in

HAEGGQUIST & ECK, LLP

earnings and job benefits in an amount to be determined according to proof at the time of trial.

**COUNT IV**

**Declaratory Relief**
**Code of Civil Procedure §1060**

**(Against Defendant)**

71.    Plaintiff realleges and incorporates by reference the allegations contained in the preceding and subsequent paragraphs, as if fully set forth herein.

72.    "Declaratory relief actions are well recognized in California law." *Snyder v. Cal. Ins. Guarantee Ass'n*, 229 Cal. App. 4th 1196, 1207 (2014). Any person interested under a written instrument or contract, or who desires a declaration of his or her rights concerning another may, in cases of actual controversy relating to the legal rights and duties of the respective parties, bring an original action in the superior court for a declaration of his or her rights and duties. Cal. Code Civ. Proc. §1060. Plaintiff may ask for a declaration of rights or duties and the court may make a binding declaration of these rights or duties. *Id.* The declaration may be affirmative or negative in form and effect, and the declaration shall have the force of a final judgment. *Id.*

73.    Here, there exists an actual controversy relating to the legal rights and duties of the respective parties regarding the legality, validity, unconscionability, and enforcement of the clauses in the Noncompete Agreement and Compensation Plans.

74.    First, the Noncompete Agreement contains a "Non-Solicitation" clause and "Non-Compete" clause in paragraph 4 that violate well-settled law and which unlawfully restrict employee mobility and healthy and open competition. *Edwards*, 44 Cal. 4th at 948; *AMN Healthcare*, 28 Cal. App. 5th at 936; Cal. Bus. & Prof. Code §§16600-16600.5.

75.    Second, the Noncompete Agreement and Compensation Plans contain unlawful choice of law and venue provisions that violate California Labor Code §925.

HAEGGQUIST & ECK, LLP

76.    Third, the Compensation Plans contain an unlawful provision regarding the timing of payment of commissions that violate California Labor Code §204.

77.    Fourth, the Compensation Plans contain a vague, ambiguous, and unconscionable term relating to the forfeiture of commission if the employee is not employed on the date the contract for the commission is signed even though the employee did all other things required of her to earn the commission. *See Ellis*, 18 Cal. App. 4th at 1807; Cal. Civ. Code §1670.5(a); *Schachter*, 47 Cal. 4th at 622 (she ""who shakes the tree is the one to gather the fruit"") (citations omitted); *Willson*, 89 Cal. App. 2d at 595-96.

78.    Plaintiff seeks an order from the Court declaring the Non-Solicitation and Non-Compete clauses are unlawful and void, and for an order of injunctive relief requiring Defendant to: (a) strike the violative provisions from all its agreements with California employees; (b) provide written notice compliant with Business and Professions Code §16600.1(b)(1) to all current and former California employees that the violative clauses are void; (c) cease from attempting to enforce the violative clauses on California employees, because the clauses violate not only the Business and Professions Code, but also Labor Code §432.5,which prohibits employers from requiring employees to agree to any term or condition of employment that is known by the employer to be prohibited by law; and (d) pay Plaintiff owed commissions.

**COUNT V**

**Wrongful Termination in Violation of Public Policy**

**(Against Defendant)**

79.    Plaintiff realleges and incorporates by reference the allegations contained in the preceding and subsequent paragraphs, as if fully set forth herein.

80.    Wrongful termination from employment is tortious when the termination occurs in violation of a fundamental public policy. *See Stevenson v. Superior Ct.*, 16 Cal. 4th 880, 888-89 (1997). In California, "if [the employer] discharged [the

employee] in order to avoid paying him the commissions, vacation pay, and other amounts he had earned, it violated the fundamental public policy of this state." *Gould v. Maryland Sound Indus., Inc.*, 31 Cal. App. 4th 1137, 1148 (1995); *Schachter*, 47 Cal. 4th at 622 (she "'"who shakes the tree is the one to gather the fruit"'") (citations omitted) (citing *Willson*, 89 Cal. App. 2d at 595-96). Moreover, California recognizes a common law cause of action for wrongful termination in violation of public policy, including for gender and age discrimination. *Badih v. Myers*, 36 Cal. App. 4th 1289, 1296 (1995) ("Since article I, section 8 [of the California Constitution] expresses a fundamental public policy against sex discrimination in employment . . . [a plaintiff] was properly allowed to maintain her cause of action for wrongful discharge in contravention of public policy."); *cf. Stevenson*, 16 Cal. 4th at 885 (holding "the policy prohibiting employment discrimination against older workers satisfies each of the criteria this court has established as necessary to support a common law action for tortious wrongful discharge").

81.    As detailed in this Complaint, Defendant treated Plaintiff adversely because of her gender. Ultimately, Defendant terminated Plaintiff's employment to avoid paying Plaintiff over $450,000 in commissions on an account she had done everything in her job duties to earn, and gave the commission to a younger male who did not procure the account. In the process, Defendant violated settled public policy against gender discrimination and violated the Procuring Cause Doctrine, breached its fiduciary obligations, and used an unconscionable forfeiture provision to avoid paying Plaintiff owed commission.

82.    As a proximate result of Defendant's wrongful conduct, Plaintiff has suffered, and continues to suffer, substantial losses in earnings, earning capacity, and other benefits of employment, all in an amount to be determined according to proof at the time of trial. Plaintiff will also suffer tax consequences due to Defendant's failure to pay Plaintiff money owed, which will come due in a lump sum in the future.

Accordingly, Plaintiff is entitled to an additional amount of damages to offset the tax consequences of a lump sum award for lost earnings, plus interest.

83.     As a further proximate result of Defendant's wrongful conduct, Plaintiff has suffered, and continues to suffer, humiliation, embarrassment, emotional distress, and mental anguish, all in an amount to be determined according to proof at the time of trial.

84.     In performing the acts alleged herein, Defendant acted with oppression, fraud, malice, and with conscious disregard for Plaintiff's rights, and Plaintiff is therefore entitled to punitive damages against Defendant in an amount sufficient to punish and make an example of Defendant to deter further despicable conduct. The retaliatory actions and decisions to wrongfully discipline and terminate Plaintiff's employment was authorized, adopted, approved, and/or made by an officer, director, or managing agent of Defendant.

85.     Finally, Plaintiff is entitled to recover her reasonable attorneys' fees and costs pursuant to Code of Civil Procedure §1021.5, and any other applicable provision for attorneys' fees and costs.

## COUNT VI

### Discrimination Based on Gender
### In Violation of California Government Code §12940(a)

### (Against Defendant)

86.     Plaintiff realleges and incorporates by reference the allegations contained in the preceding and subsequent paragraphs, as if fully set forth herein.

87.     Government Code §12940 states in pertinent part: "It is an unlawful employment practice . . . [f]or an employer, because of the . . . sex [and/or] gender . . . of any person, . . . to discharge the person from employment . . . or to discriminate against the person in compensation or in terms, conditions, or privileges of employment." Cal. Gov't Code §12940(a).

HAEGGQUIST & ECK, LLP

88. At all times mentioned herein, Plaintiff was in a class of persons protected by Government Code §12940 because of her sex and/or gender and the intersection or combination of those characteristics. Defendant knew, perceived, and treated Plaintiff as being in these protected classes because Defendant knew Plaintiff was a woman during her employment with Defendant.

89. As alleged herein, Defendant discriminated against Plaintiff because of her sex and/or gender, and/or the intersection or combination of those characteristics, in terms, conditions, and privileges of employment. Based on information and belief, Defendant treated Plaintiff poorly and took adverse employment actions against Plaintiff because of her protected characteristics, including: (1) cutting her sales territories and handing the same to younger and/or male employees; (2) promoting younger and/or male employees over her; (3) removing Plaintiff's nearly-closed deals and handing the same to younger and/or male employees; (4) denying Plaintiff her commissions; and/or (5) wrongfully discharging Plaintiff and giving the commission she had procured to a younger, male employee who did not do the work to earn the commission.

90. As a proximate result of Defendant's wrongful conduct, Plaintiff has suffered, and continues to suffer, substantial losses in earnings, earning capacity, and other benefits of employment, all in an amount to be determined according to proof at the time of trial. Plaintiff will also suffer tax consequences due to Defendant's failure to pay Plaintiff money owed, which will come due in a lump sum in the future. Accordingly, Plaintiff is entitled to an additional amount of damages to offset the tax consequences of a lump sum award for lost earnings, plus interest.

91. As a further proximate result of Defendant's wrongful conduct, Plaintiff has suffered, and continues to suffer, humiliation, embarrassment, emotional distress, and mental anguish, all in an amount to be determined according to proof at the time of trial.

HAEGGQUIST & ECK, LLP

92.   In performing the acts alleged, which were committed, authorized, and/or adopted and approved by Defendant's officers, directors, or managing agents, SecurityScorecard acted with oppression, fraud, malice, and with conscious disregard for the rights of Plaintiff, and Plaintiff is therefore entitled to punitive damages against Defendant in an amount appropriate to punish and make an example of Defendant.

93.   Plaintiff is also entitled to attorneys' fees and costs pursuant to Government Code §12965(c)(6), because of Defendant's wrongful conduct.

## COUNT VII

### Gender Pay Discrimination
### In Violation of California Labor Code §1197.5(a)

### (Against Defendant)

94.   Plaintiff realleges and incorporates by reference the allegations contained in the preceding and subsequent paragraphs, as if fully set forth herein.

95.   Labor Code §1197.5(a) makes it unlawful for an employer to "pay any of its employees at wage rates less than the rates paid to employees of the opposite sex for substantially similar work, when viewed as a composite of skill, effort, and responsibility, and performed under similar working conditions." Cal. Lab. Code §1197.5(a).

96.   At all times mentioned herein, Plaintiff was a female employed by Defendant and was in a class of persons protected by California Labor Code §1197.5(a) because of her gender.

97.   As explained above, Plaintiff did substantially *more* work than her younger, male colleague who was paid Plaintiff's sales commission for her multi-million-dollar deal. Plaintiff performed her work as a Sales Director with a higher level of skill, effort and responsibility than her younger, male colleague for performing substantially similar work, when viewed as a composite of skill, effort, and responsibility. However, in violation of California Labor Code §1197.5, Defendant willfully paid Plaintiff less than her similarly situated male colleague by

HAEGGQUIST & ECK, LLP

denying Plaintiff her hard-earned sales commission and awarding the male colleague with the commission.

98.    The differential in pay between Plaintiff and her male counterparts was due to gender and not due to either a seniority system, a merit system, a system that measures earnings by quantity or quality of production, or any other bona fide factor such as education, training, or experience. To the extent Defendant allegedly relied upon one or more of these bona fide factors, such factors were not applied lawfully and do not account for the entire wage differential.

99.    As a proximate result of Defendant's intentional conduct, Plaintiff has suffered, and continues to suffer, a substantial loss of wages and benefits based on the unlawful differential. Pursuant to Labor Code §1197.5(h), Plaintiff is entitled to recovery of the differential in wages and benefits, plus interest, in an amount to be determined according to proof at the time of trial.

100.    Plaintiff is entitled to liquidated damages pursuant to Labor Code §1197.5(h), as a result of Defendant's wrongful conduct.

101.    Plaintiff is also entitled to attorneys' fees and costs pursuant to Labor Code §1197.5(h), because of Defendant's wrongful conduct.

### COUNT VIII

### Failure to Timely Pay Wages Due and Owing
### In Violation of California Labor Code §218

### (Against Defendant)

102.    Plaintiff realleges and incorporates by reference the allegations contained in the preceding and subsequent paragraphs, as if fully set forth herein.

103.    California Labor Code §218 provides for a private right of action for "any wage claimant to sue directly or through an assignee for any wages or penalty due them" under the provisions of Article 1 (§§200-244) of the Labor Code. Cal. Lab. Code §218.

104.  "Wages" are defined as "all amounts for labor performed by employees of every description, whether the amount is fixed or ascertained by the standard of time, task, piece, commission basis, or other method of calculation." Cal. Lab. Code §200(a). "Under this definition, sales commissions are considered 'wages.'" *Sciborski*, 205 Cal. App. 4th at 1167.

105.  "All wages . . . earned by any person in any employment are due and payable twice during each calendar month, on days designated in advance by the employer as the regular paydays." Cal. Lab. Code §204(a). "Every employer shall pay to each employee, on the established payday for the period involved, not less than the applicable minimum wage for all hours worked in the payroll period, whether the remuneration is measured by time, piece, commission, or otherwise." 8 Cal. Code Regs. §11040(4)(B). "If commissions cannot be calculated as of the time employment is terminated, California law permits an employer to pay commissions after the termination date, as long as they are paid once they can be calculated." *Nordstrom Comm'n Cases*, 186 Cal. App. 4th 576, 587 (2010).

106.  As detailed above, Defendant's Compensation Plans stated that it would attempt to pay commissions by the end of the following month, rather than once the commission was earned or calculated, and indeed the company routinely took weeks past the legal due date to pay out earned commissions. As such, Defendant routinely violated California Labor Code §218 by paying Plaintiff's wages late, which accrue interest when not timely paid.

107.  Moreover, as set forth above in this Complaint, Defendant owes Plaintiff a substantial commission exceeding $450,000. Plaintiff did everything under her control to earn the commission which was unconscionably and unlawfully stripped from Plaintiff and given to a younger, male employee.

108.  As a direct and proximate result of Defendant's unlawful conduct, Plaintiff suffered damages in an amount to be proven at the time of trial.

HAEGGQUIST & ECK, LLP

109.   Plaintiff may also recover penalties, costs, reasonable attorneys' fees, and prejudgment interest. Cal. Lab. Code §§218.5, 218.6.

**COUNT IX**

**Unlawful and Unfair Competition**
**In Violation of California Business & Professions Code §§17200, *et seq.***

**(Against Defendant)**

110.   Plaintiff realleges and incorporates by reference the allegations contained in the preceding and subsequent paragraphs, as if fully set forth herein.

111.   Defendant is a "person" as defined under Business and Professions Code §17021. Each of the directors, officers, and/or agents of Defendant is equally responsible for the acts of the others as set forth in Business and Professions Code §17095.

112.   The actions of Defendant constitute unlawful, unfair, and fraudulent business practices within the meaning of Business and Professions Code §§17200, *et seq.*

113.   As described above, Defendant has conducted the following unlawful activities:

> (i)     violation of Labor Code §§201, 204, 218, 219, 223, 432.5, 925, and 1197.5;
>
> (ii)    violation of Business and Professions Code §§16600 – 16600.5;
>
> (iii)   violation of the Federal Trade Commission, Final Rule, RIN 3084-AB74, 16 C.F.R. Part 919;
>
> (iv)    Section 5 of the FTC Act, 15 U.S.C. §45;
>
> (v)     wrongful termination in violation of public policy; and
>
> (vi)    breach of the covenant of good faith and fair dealing.

114.   Defendant's activities also constitute unfair practices in violation of Business and Professions Code §§17200, *et seq.*, because Defendant's practices violate the above noted laws, and/or violate an established public policy, and/or the

HAEGGQUIST & ECK, LLP

practice was immoral, unethical, oppressive, unscrupulous, and substantially injurious to Plaintiff.

115.   The identified violations constitute business practices because they were done repeatedly over a period of time and in a systematic manner, to the detriment of Plaintiff and others.

116.   As a result of Defendant's violations of the California Labor Code and other identified laws, Plaintiff has suffered injury-in-fact and has lost money as a result. This injury-in-fact and loss of money consists of the lost wages and other restitutionary remedies provided by the identified laws and other resulting harms. Plaintiff is entitled to restitution, an injunction, declaratory relief, and other equitable relief against such unlawful practices to prevent future harm for which there is no adequate remedy at law.

117.   As a direct and proximate result of the unfair business practices of Defendant, Plaintiff is entitled to equitable and injunctive relief, including full restitution of all wages which have been unlawfully lost as a result of the business acts and practices described herein, and requests the Court issue an order enjoining Defendant to cease and desist from engaging in the practices described herein for the maximum time permitted pursuant to Business and Professions Code §17208, including any tolling.

118.   Plaintiff is also entitled to attorneys' fees, pursuant to Code of Civil Procedure §1021.5, and any other applicable provision for attorneys' fees and costs, based upon the violation of the underlying public policies.

## PRAYER

WHEREFORE, Plaintiff seeks judgment as follows:

A.     For compensatory damages, including unpaid wages (past and future), loss of wages and benefits (past and future), and emotional distress damages (past and future) according to proof at trial;

B.     For liquidated damages pursuant to Labor Code §1197.5(h);

HAEGGQUIST & ECK, LLP

C.    For attorneys' fees and costs of suit pursuant to all applicable provisions, including without limitation, Government Code §12965(c)(6), Labor Code §§218.5, 218.6, 925(c), and 1197.5(h), Business and Professions Code §16600.5(e)(2), Code of Civil Procedure §1021.5, and any other applicable provision for attorneys' fees and costs;

D.    For pre-judgment and post-judgment interest to the extent allowable by law;

E.    For punitive and exemplary damages, according to proof;

F.    For an injunction restraining Defendant from continuing to engage in unlawful and unfair business practices;

G.    For declaratory relief; and

H.    For such other and further relief as the Court deems just and proper.

<strong>DEMAND FOR JURY TRIAL</strong>

Plaintiff demands a trial by jury on all applicable claims.

Dated: October 30, 2024                 HAEGGQUIST & ECK, LLP
                                        ALREEN HAEGGQUIST (221858)
                                        AARON M. OLSEN (259923)
                                        ANNA C. SCHWARTZ (346268)


                                        By: _____
                                             AARON M. OLSEN

                                        225 Broadway, Suite 2050
                                        San Diego, CA 92101
                                        Telephone: (619) 342-8000
                                        Facsimile: (619) 342-7878

                                        Attorneys for Plaintiff Jennifer Crumley

HAEGGQUIST & ECK, LLP

COMPLAINT FOR DAMAGES AND OTHER RELIEF

1

## EXHIBIT INDEX

| Exhibit # | Description | Page |
|---|---|---|
| 1 | October 28, 2024 California Civil Rights Department's "Right to Sue" | 34 |
| 2 | Employee's Propriety Information and Inventions and Non-Competition Agreement | 41 |
| 3 | Variable Compensation Plan – FY 2023 | 51 |

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

HAEGGQUIST & ECK, LLP

COMPLAINT FOR DAMAGES AND OTHER RELIEF

# EXHIBIT 1

Exhibit 1
Page 034

STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency                    GAVIN NEWSOM, GOVERNOR

KEVIN KISH, DIRECTOR

## Civil Rights Department

651 Bannon Street, Suite 200 | Sacramento | CA | 95811
1-800-884-1684 (voice) | 1-800-700-2320 (TTY) | California's Relay Service at 711
calcivilrights.ca.gov | contact.center@calcivilrights.ca.gov

October 28, 2024

Anna Schwartz
Haeggquist & Eck, LLP, 225 Broadway, #2050
San Diego, CA 92101

RE:    **Notice to Complainant's Attorney**
CRD Matter Number: 202410-26847328
Right to Sue: Crumley / SecurityScorecard, Inc.

Dear Anna Schwartz:

Attached is a copy of your complaint of discrimination filed with the Civil Rights
Department (CRD) pursuant to the California Fair Employment and Housing Act,
Government Code section 12900 et seq. Also attached is a copy of your Notice of Case
Closure and Right to Sue.

**Pursuant to Government Code section 12962, CRD will not serve these
documents on the employer.** You must serve the complaint separately, to all named
respondents. Please refer to the attached Notice of Case Closure and Right to Sue for
information regarding filing a private lawsuit in the State of California. A courtesy "Notice
of Filing of Discrimination Complaint" is attached for your convenience.

Be advised that the CRD does not review or edit the complaint form to ensure that it
meets procedural or statutory requirements.

Sincerely,

Civil Rights Department

CRD - ENF 80 RS (Revised 2024/05)

Exhibit 1
Page 035

STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency                    GAVIN NEWSOM, GOVERNOR

KEVIN KISH, DIRECTOR

**Civil Rights Department**
651 Bannon Street, Suite 200 | Sacramento | CA | 95811
1-800-884-1684 (voice) | 1-800-700-2320 (TTY) | California's Relay Service at 711
calcivilrights.ca.gov | contact.center@calcivilrights.ca.gov

October 28, 2024

RE:   **Notice of Filing of Discrimination Complaint**
      CRD Matter Number: 202410-26847328
      Right to Sue: Crumley / SecurityScorecard, Inc.

To All Respondent(s):

Enclosed is a copy of a complaint of discrimination that has been filed with the Civil
Rights Department (CRD) in accordance with Government Code section 12960. This
constitutes service of the complaint pursuant to Government Code section 12962. The
complainant has requested an authorization to file a lawsuit. A copy of the Notice of
Case Closure and Right to Sue is enclosed for your records.

Please refer to the attached complaint for a list of all respondent(s) and their
contact information.

No response to CRD is requested or required.

Sincerely,

Civil Rights Department

STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency

GAVIN NEWSOM, GOVERNOR

KEVIN KISH, DIRECTOR

**Civil Rights Department**
651 Bannon Street, Suite 200 | Sacramento | CA | 95811
1-800-884-1684 (voice) | 1-800-700-2320 (TTY) | California's Relay Service at 711
calcivilrights.ca.gov | contact.center@calcivilrights.ca.gov

October 28, 2024

Jennifer Crumley
225 Broadway, Suite 2050
San Diego, CA 92101

RE:     **Notice of Case Closure and Right to Sue**
CRD Matter Number: 202410-26847328
Right to Sue: Crumley / SecurityScorecard, Inc.

Dear Jennifer Crumley:

This letter informs you that the above-referenced complaint filed with the Civil Rights Department (CRD) has been closed effective October 28, 2024 because an immediate Right to Sue notice was requested.

This letter is also your Right to Sue notice. According to Government Code section 12965, subdivision (b), a civil action may be brought under the provisions of the Fair Employment and Housing Act against the person, employer, labor organization or employment agency named in the above-referenced complaint. The civil action must be filed within one year from the date of this letter.

To obtain a federal Right to Sue notice, you must contact the U.S. Equal Employment Opportunity Commission (EEOC) to file a complaint within 30 days of receipt of this CRD Notice of Case Closure or within 300 days of the alleged discriminatory act, whichever is earlier.

Sincerely,

Civil Rights Department

CRD - ENF 80 RS (Revised 2024/05)

Exhibit 1
Page 037

1

## COMPLAINT OF EMPLOYMENT DISCRIMINATION
## BEFORE THE STATE OF CALIFORNIA
### Civil Rights Department
### Under the California Fair Employment and Housing Act
### (Gov. Code, § 12900 et seq.)

2

3

4

**In the Matter of the Complaint of**

5    Jennifer Crumley                                    CRD No. 202410-26847328

6                          Complainant,

7    vs.

8    SecurityScorecard, Inc.
     1140 Avenue of the Americas, 19th Floor
9    New York City, NY 10036

10                         Respondents

11   _____

12   **1.** Respondent **SecurityScorecard, Inc.** is an **employer** subject to suit under the California Fair
13   Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.).

14

15   **2**. Complainant **Jennifer Crumley**, resides in the City of **San Diego,** State of **CA.**

16
17   **3.** Complainant alleges that on or about **January 1, 2024**, respondent took the
     following adverse actions:

18   **Complainant was discriminated against** because of complainant's sex/gender and as a
19   result of the discrimination was terminated, denied hire or promotion, reprimanded, denied
     equal pay, other, denied work opportunities or assignments.

20   **Additional Complaint Details:** Jennifer Crumley is an experienced and successful sales
21   professional. For over 20 years, Ms. Crumley excelled in various high technology sales roles
     before she was poached from her Vice President of Sales position by SecurityScorecard – a
22   cybersecurity startup. During her four years at SecurityScorecard, while enduring a
     stereotypical "boys club," Ms. Crumley routinely excelled as the highest performing sales
23   representative for SecurityScorecard's busiest region—the West Coast.  In May 2021, Ms.
     Crumley procured SecurityScorecard's largest-ever sales commitment for cybersecurity
24   services with Southern California Edison ("SCE"). Over the next two and a half years, Ms.
     Crumley worked tirelessly to push the SCE deal towards closing, completing all steps
25   required of her under SecurityScorecard's sales commission plan and earning her a record-

26                                    -1-
                        *Complaint – CRD No. 202410-26847328*
27
     Date Filed: October 28, 2024
28
                                                        CRD-ENF 80 RS (Revised 2024/05)

Exhibit 1
Page 038

1  breaking six-figure commission. Sadly, in October 2023, after Ms. Crumley had completed
2  all material tasks on her part, as the deal was being finalized by the company's legal
   department for signing, SecurityScorecard unlawfully fired Ms. Crumley to intentionally
3  deprive her of the largest sales commission the company had ever seen. Immediately after
   her termination, the company handed over her record-breaking sales commission and her
4  West Coast sales territory to a younger, male sales employee who was an upcoming
   member of the boys' club.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26
                                          -2-
                        *Complaint – CRD No. 202410-26847328*
27
   Date Filed: October 28, 2024
28
                                                      CRD-ENF 80 RS (Revised 2024/05)

Exhibit 1
Page 039

VERIFICATION

I, **Anna Schwartz**, am the **Attorney** in the above-entitled complaint.  I have read the foregoing complaint and know the contents thereof.  The matters alleged are based on information and belief, which I believe to be true.

On October 28, 2024, I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

**San Diego, CA**

-3-
*Complaint – CRD No. 202410-26847328*

Date Filed: October 28, 2024

CRD-ENF 80 RS (Revised 2024/05)

Exhibit 1
Page 040

# EXHIBIT 2

Exhibit 2
Page 041

## EMPLOYEE'S PROPRIETARY INFORMATION AND

## INVENTIONS AND NON-COMPETITION AGREEMENT

As an employee of SecurityScorecard, Inc. (the "Company"), I recognize that the Company is engaged in a continuous program of research, development and production with respect to its business.

RECITALS:

I understand that:

A.    Definitions for certain of the capitalized terms used in this Employee's Proprietary Information and Inventions and Non-Competition Agreement ("Agreement") are contained in <u>Exhibit A</u> attached to this Agreement.

B.    The Company possesses and will continue to possess Proprietary Information.  In consideration for the compensation received by me from the Company, I hereby agree as follows:

1.    <u>Protection of Proprietary Information</u>.

   (a)    <u>Property of the Company</u>.  All Proprietary Information shall be the sole property of the Company and its assigns or a third party, as applicable, and the Company and its assigns or such third party shall be the sole owner of all patents and other rights in connection with such Proprietary Information.  I hereby assign to the Company any rights I may have or acquire in any or all Proprietary Information.  During the term of my employment by the Company and at all times thereafter, I will keep in confidence and trust all Proprietary Information, and I will not directly or indirectly disclose, sell, use, lecture upon or publish any Proprietary Information or anything relating to it without the prior written consent of the Company, except as may be necessary in the ordinary course of performing my duties as an employee of the Company and except as required by law (subject to providing the Company with an opportunity to seek a protective order or other such remedy).  I will obtain the Company's written approval before publishing or submitting for publication any material that relates to my work at the Company or incorporates any Proprietary Information.

   (b)    <u>Property of Third Parties</u>.  I recognize that the Company has received and in the future will receive information from third parties which is private or proprietary information, subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes.  I agree, during the term of my employment and thereafter, to hold all such private or proprietary information received from third parties in the strictest confidence and not to disclose or use it, except as necessary in carrying out my work for the Company consistent with the Company's agreement with such third party and except as required by law (subject to providing the Company with an opportunity to seek a protective order or other such remedy).

   My obligations regarding Proprietary Information shall continue until such time as the Proprietary Information is publicly known without fault on my own part.

2.    <u>Avoid Conflict of Interest</u>.  During the course of my employment, I shall inform the Company before accepting any employment, consulting or other relationship with another person or entity (a) in any field related to the Company's line of business or (b) in a position that requires a significant time commitment.  Lack of objection by the Company regarding any particular outside activity does not in any way reduce my obligations under this Agreement.

3.  <u>Return of Materials</u>.  All apparatus, computers, computer files and media, data, documents, drawings, engineering log books, equipment, inventor notebooks, programs, prototypes, records, samples, equipment and other information and physical property, whether or not pertaining to Proprietary Information, furnished to me by the Company, or produced by myself or others in connection with my employment, shall be and remain the sole property of the Company and shall be returned promptly to the Company as and when requested by the Company. Should the Company not so request, I shall return and deliver all such property upon termination of my employment for any reason and I will not take with me any such property or any reproduction of such property upon such termination.  I further agree that any property situated on the Company's premises and owned by the Company, including computers, computer files, e-mail, voicemail, disks and other electronic storage media, filing cabinets or other work areas, is subject to inspection by Company personnel at any time with or without notice.

4.  <u>Non-Solicitation, Non-Compete and Non-Disparagement</u>.

   (a)   <u>Non-Solicitation</u>. I agree that, during the period of my employment and for a period of two (2) years following termination of my employment with the Company for any reason, I will not directly or indirectly (a) solicit or in any manner encourage employees, officers, directors, affiliates or consultants of the Company to end their relationships with the Company; or (b) other than on behalf of the Company, call on, solicit or take away, or attempt to do any of the same, the business of any business partners or other associates of the Company with whom the Company had relationships or with whom I was otherwise acquainted during the term of my employment.  By signing this Agreement, I acknowledge and agree that the names, addresses and specifications of the Company's business partners and other associates constitute Proprietary Information and that the sale or unauthorized use or disclosure of this or any other Proprietary Information that I obtained during the course of this Agreement would constitute unfair competition with the Company.  I promise not to engage in any unfair competition with the Company either during the term of my employment or at any time thereafter.

   (b)   <u>Non-Compete</u>. I agree that, during my employment and for a period of two (2) years following the termination of my employment with the Company for any reason, I will not, directly or indirectly, own, manage, operate, control or participate in the ownership, management or control of, or be connected as an officer, employee, partner, director, consultant or otherwise with, or have any financial interest in, or aid or assist anyone else in the conduct of, any entity or business that competes with the Business during my employment and during the period of two (2) years following the termination of my employment) conducted by the Company or any of its subsidiaries or affiliates world-wide, within the United States or within any other area in which the Company conducts its Business on the date that my employment with the Company terminates.  I understand that the Business is conducted, in part, over the Internet and broadband networks and that therefore a broad geographical restriction is necessary as I would be able to compete effectively against the Company from any location in which I could access the Internet or broadband networks. Notwithstanding the foregoing, my ownership of securities of a public company engaged in competition with the Company's Business not in excess of two percent (2%) of any class of such securities shall not be considered a breach of the covenants set forth in this Section. If, at the time of enforcement of this paragraph (b), an arbitrator shall hold that the duration, scope or area restrictions stated herein are unreasonable under circumstances then existing, the parties agree that the maximum duration, scope or area reasonable under such circumstances shall be the substituted for the stated duration, scope or area and that the arbitrator shall be allowed to revise the restrictions contained herein to cover the maximum period, scope and area permitted by law.

   (c)   <u>Nondisparagement</u>.  The parties hereto agree that neither will make, or cause to be made, any statements, observations, or opinions, or communicate any information (whether oral or written), that disparages or is likely in any way to harm the reputation of the other.  Nothing contained in this Agreement shall be deemed to prohibit either party from testifying truthfully under oath pursuant to

DocuSign Envelope ID: 9E447A61-8CA0-418F-962C-3BD96AF8B183

any lawful court order or subpoena or otherwise responding to or providing disclosures required by law.

5. <u>Inventions.</u> I will promptly disclose to the Company, or any persons designated by it, any and all Inventions; such disclosure shall continue for one (1) year after termination of my employment with respect to any and all Inventions made, conceived, reduced to practice or learned during such one (1) year term. If any application for any United States or foreign patent related to or useful in the business of the Company or any customer or other business associate of the Company shall be filed by me or for me during the period of one (1) year after my employment is terminated, the subject matter covered by such application shall be presumed to have been conceived during my employment with the Company.

6. <u>Ownership and Protection of Inventions.</u>

   (a) <u>The Company owns Inventions.</u> I agree that any and all Inventions shall be the sole property of the Company and its assigns, and the Company and its assigns shall be the sole owner of all patents, trade-marks, copyrights and other rights in connection with such Inventions.

   (b) <u>Inventions Protection.</u> I hereby assign to the Company any rights I may have or acquire in Inventions. In addition, to the extent permitted by federal copyright law, the parties agree that any works resulting from my work under this Agreement shall be "works for hire" as defined in the federal copyright law. I hereby assign to the Company all of my works of authorship and all rights of copyright, trademark, patent and other such rights ("Intellectual Property Rights") in such works to the extent such works result from my work under this Agreement. I further agree, as to any and all Inventions, to assist the Company in every proper way (but at the Company's expense) to obtain and from time to time enforce Intellectual Property Rights on Inventions in any and all countries. To that end, I will perform any further acts and execute and deliver all documents for use in applying for and obtaining such Intellectual Property Rights there-on and enforcing the same, as the Company may desire, together with any assignments of such protections to the Company or persons designated by it. My obligation to assist the Company in obtaining and enforcing Intellectual Property Rights on Inventions in any and all countries shall continue beyond the termination of my employment, but, after such termination, the Company shall compensate me at the rate of US $80 per hour for time actually spent by me at the Company's request on such assistance. I acknowledge that I may be unavailable when the Company needs to secure my signature for lawful and necessary documents required to apply for or execute any Intellectual Property Rights with respect to Inventions (including renewals, extensions, continuations, divisions or continuations in part of patent applications). Therefore, I agree to irrevocably designate and appoint the Company and its duly authorized officers and agents, as my agents and attorneys-in-fact, to act for and in my behalf and instead of me, to execute and file any such application(s) and to do all other lawfully permitted acts to further the prosecution and issuance of patents, copyrights, trademarks and other protections on Inventions with the same legal force and effect as if executed by me. The Company shall also have the right to keep any and all Inventions as trade secrets. I hereby waive and quitclaim to the Company Intellectual Property Rights. Any and all claims of any nature whatsoever, which I now or may hereafter have for infringement of Intellectual Property Rights are assigned hereunder to the Company.

   (c) <u>Inventions Assigned to the United States.</u> I agree to assign to the United States government all my right, title, and interest in and to any and all Inventions whenever such full title is required to be in the United States by a contract between the Company and the United States or any of its agencies.

   (d) <u>Maintenance of Records.</u> I agree to keep and maintain adequate and current written records of all Inventions made by me (solely or jointly with others) during the term of my employment with the Company. The records will be in the form of notes, sketches, drawings, and any other format that may be specified

by the Company. The records will be available to and remain the sole property of the Company at all times.

7.  <u>List of Pre-Employment Inventions</u>. I have attached to this Agreement as <u>Exhibit B</u> a complete list of all developments, discoveries, improvements, inventions, trade secrets, or technical or journal writings or other works of authorship which I have made or conceived or first reduced to practice alone or jointly with others prior to my engagement by the Company which are not subject to a confidentiality agreement that would bar such listing (collectively "Pre-Employment Inventions"); and I covenant that such list is complete. If no such list is attached to this Agreement, I represent that I have made no such Pre-Employment Inventions at the time of signing this Agreement. The Company will not require me to assign any rights I may have in any of the listed Pre-Employment Inventions. Furthermore, the listed Pre-Employment Inventions will not be classified as Proprietary Information or Inventions. If in the course of my employment with the Company, I incorporate into a Company product, process or machine a Pre-Employment Invention or any other inventions, technical writings, papers, journal articles, developments, improvements, and trade secrets which were made by me prior to my employment with the Company, which are owned by me or in which I have an exclusive interest, the Company is hereby granted and shall have a nonexclusive, royalty-free, irrevocable, perpetual, worldwide, transferable and sublicensable license to make, have made, modify, use and sell such Pre-Employment Invention as part of or in connection with such product, process or machine. I acknowledge and agree that the Company and its subsidiaries or affiliates are free to compete or develop information, inventions and products within the areas and type of the Pre-Employment Inventions.

8.  <u>No Conflicting Obligation</u>. I represent that my performance of all the terms of this Agreement and that my employment by the Company does not and will not breach any agreement to keep in confidence proprietary information acquired by me in confidence or in trust prior to my employment by the Company. I have not entered into, and I agree I will not enter into, any agreement either written or oral in conflict with this Agreement. I also understand that I am not to breach any obligation of confidentiality I have to others during my employment with the Company.

9.  <u>No Improper Use of Information of Prior Employers or Others</u>. As part of the consideration for the offer of employment by the Company and of my employment or continued employment by the Company, I have not brought and will not bring to the Company, or use or disclose in the performance of my responsibilities any equipment, supplies, facility, electronic media, software, trade secret or other information or property of any former employer or any other person or entity which are not generally available to the public, unless I have obtained their written authorization for its possession and use.

10. <u>Notification of New Employer</u>. In the event that I leave the employ of the Company, I hereby consent to the notification of my new employer of my rights and obligations under this Agreement.

11. <u>Binding Arbitration</u>. I agree that any dispute arising out of or related to the employment relationship between me and the Company, including the breach of this Agreement or the termination of the employment relationship, and any allegations of unfair or discriminatory treatment arising under state or federal law or otherwise, shall be resolved in accordance with the terms of the Company's Arbitration Agreement which is incorporated into this Agreement.

12. <u>Modifications</u>. No modification of this Agreement shall be valid unless made in writing and signed by the parties hereto.

13. <u>Severability</u>. If any term or provision of the Agreement shall be declared invalid, illegal or unenforceable, such term or provision shall be amended to achieve as nearly as possible the same effect of protecting Proprietary Information as the original term or provision, and all remaining provisions shall continue in full force and effect.

DocuSign Envelope ID: 9E447A61-9C1G-418F-962D-2BD99AF8B183

14. <u>Survival of Obligations</u>.  This Agreement shall survive termination of my employment, regardless of the circumstances of such termination.

15. <u>Effective Date; Term of Agreement</u>.  This Agreement shall be effective as of the first day of my employment by the Company and shall continue for five (5) years following the termination of my service with the Company for any reason (except for the provisions of Section 1, 4(c) and 6, which shall continue without limitation.

16. <u>Binding Effect</u>.  This Agreement shall be binding upon my heirs, executors, administrators or other legal representatives and shall inure to the benefit of successors and assigns of the Company.

17. <u>Integrated Agreement</u>.  This Agreement and the employment offer letter executed between the Company and me constitute the full, complete and exclusive agreement between the Company and me with regard to their subject matter.  These Agreements supersede any previous agreements or representations, whether oral or written, express or implied between the Company and me with respect to their subject matter.  To the extent this Agreement and the employment offer letter conflict, the employment offer letter shall control.  These Agreements shall not be modified unless in writing, signed by me and the CEO or President of the Company.

18. <u>Exhibits</u>.  The following Exhibits are made a part of and incorporated by reference in this Agreement:

Exhibit A:  Definitions

Exhibit B:  List of Pre-Employment Inventions

Exhibit C:  Arbitration Agreement

19. <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without giving effect to the choice of law provisions thereof.

20. <u>Acknowledgement</u>.  I certify and acknowledge that I have carefully read all of the provisions of this Agreement and that I under-stand and will fully and faithfully comply with such provisions.

Dated: 12/18/2019

ACCEPTED AND AGREED TO BY:

Employee Signature:

SecurityScorecard, Inc.

_Jennifer Crumley_
98E46CE1C97740B...

Title : Self

Address: 755 Bear Valley Pkwy Escondido, CA 92025

By : _____

Name: Aleksandr Yampolskiy

Title: CEO

5

Exhibit 2
Page 046

DocuSign Envelope ID: 9F447A61-8CAC-418F-9620-3BD98AF8B183

# EXHIBIT A

1.   <u>DEFINITIONS</u>.  As used in the foregoing Agreement, the following terms shall have the meanings as defined below.  Where the context so indicates, a word in the singular form shall include the plural and vice-versa.

1.1   *Company* as used herein, shall include any subsidiary or affiliate of the Company.

1.2   "Business" means companies/competitors (or departments/subsidiaries/affiliates of same) in the security rating space, including but not limited to Bitsight, Riskrecon, Upguard, Normshield, and Fico, or companies in vendor risk management space, including but not limited to Cybergrx and Prevalent.

1.3   *Inventions* means all data, discoveries, designs, developments, formulae, ideas, improvements, inventions, know-how, processes, programs, and techniques, whether or not patentable or registrable under copyright, trademark or similar statutes, and all designs, trademarks and copyrightable works that I made or conceived or reduced to practice or learned, either alone or jointly with others, during the period of my employment which (a) are related or useful in the business of the Company or to the Company's actual or demonstrably anticipated research, design, development, experimental production, financing, manufacturing, licensing, distribution or marketing activity carried on by the Company, or (b) result from tasks assigned me by the Company, or (c) result from use of premises or equipment owned, leased or contracted for by the Company.

1.4   *Proprietary Information* shall mean information that has been created, discovered or developed, or has otherwise become known to the Company (including without limitation information created, discovered, developed or made known by or to me during the period of or arising out of my employment by the Company), and/or in which property rights have been assigned or otherwise conveyed to the Company, which information has commercial value in the business in which the Company is engaged.  By way of illustration but not limitation, "Proprietary Information" includes:  (a) inventions, confidential knowledge, trade secrets, ideas, data, programs, works of authorship, know-how, improvements, discoveries, designs, techniques and sensitive information the Company receives from its customers or receives from a third party under obligation to keep confidential; (b) technical information relating to the Company's existing and future products, including, where appropriate and without limitation, manufacturing techniques and procedures, production controls, software, firmware, information, patent disclosures, patent applications, development or experimental work, formulae, engineering or test data, product specification and part lists, names of suppliers, structures, models, techniques, processes and apparatus relating to the same disclosed by the Company to me or obtained by me through observation or examination of information or developments; (c) confidential marketing information (including without limitation marketing strategies, customer names and requirements and product and services, prices, margins and costs); (d) confidential future product plans; (e) confidential financial information provided to me by the Company; (f) personnel information (including without limitation employee compensation); and (g) other confidential business information.

Updated 5/1/19

DocuSign Envelope ID: 9F247A61-8CAC-418F-9620-3BD98AF8B183

**EXHIBIT B**

**LIST OF PRE-EMPLOYMENT INVENTIONS**

This List of Pre-Employment Inventions, along with any attached pages, is part of and incorporated by reference into the attached EMPLOYEE'S PROPRIETARY INFORMATION AND INVENTIONS AND NON-COMPETITION AGREEMENT.

The following is a complete list of all developments, discoveries, improvements, inventions, trade secrets and works of authorship which I have made or conceived or first reduced to practice alone or jointly with others prior to my engagement by the Company which are not subject to a confidentiality agreement that would bar such listing (collectively "Pre-Employment Inventions"). I understand that the Company will not require me to assign any rights I may have in any of the listed Pre-Employment Inventions. I further understand that the listed Pre-Employment Inventions will not be classified as Proprietary Information or Inventions. I represent that this list of Pre-Employment Inventions is complete.

[X] No Pre-Employment Inventions to report.

[ ] See below.

[ ] Additional sheets attached.

Jennifer Crumley
_____
Print Employee Full Name

12/18/2019
_____
Date

# ARBITRATION AGREEMENT

1.To the maximum extent permitted by law, I, <u>Jennifer Crumley</u>, and SecurityScorecard, Inc., a Delaware corporation (the "Company"), agree that, except as noted below, any controversy, claim or dispute arising out of or related to my employment or the termination thereof ("claims") shall be arbitrated in accordance with the following procedure:

(a)    Any and all claims shall be submitted to final and binding arbitration before the American Arbitration Association ("AAA") in New York City, New York. Such arbitration shall be in accordance with the AAA's then current version of the National Rules for the Resolution of Employment Disputes. The arbitrator shall be selected in accordance with the AAA's selection procedures in effect at the time. Either party may initiate arbitration proceedings by filing a demand for arbitration with the AAA in New York City, New York.

(b)    The arbitrator shall have the authority to grant any relief authorized by law.

(c)    The arbitrator shall have exclusive authority to resolve all claims covered by this arbitration agreement, and any dispute relating to the interpretation, applicability, enforceability or formation of this arbitration agreement, including, but not limited to, any claim that all or any part of this arbitration agreement is void or voidable. Any issues involving the arbitrability of a dispute shall be governed by the Federal Arbitration Act, 9 U.S.C. § 1 et seq.

(d)    All fees and expenses relating to any arbitration (including, without limitation, the reasonable legal fees and expenses of the prevailing party and expert witness fees) arising pursuant hereto shall be paid by the non-prevailing party, and the arbitrator shall include an award of such amounts in its decision.

(e)    The claims covered by the above include, but are not limited to, claims for wrongful termination, unpaid wages or compensation, breach of contract, torts, violation of public policy, claims for harassment or discrimination (including, but not limited to, race, sex, religion, national origin, age, marital status, medical condition, disability, or sexual orientation), claims for benefits (except where an employee benefit or pension plan specifies a procedure for resolving claims different from this one), claims for physical or mental harm or distress, or any other employment-related claims under any federal, state or other governmental law, statute, regulation or ordinance, including, but not limited to, Title VII of the Civil Rights Act of 1965, the Americans With Disabilities Act, the Age Discrimination in Employment Act, and any other statutes or laws relating to an employee's relationship with the employer, and claims related to the Employee's Proprietary Information and Inventions and Non-Competition Agreement executed by me a copy of which is attached hereto. However, claims for workers' compensation benefits and unemployment compensation benefits are not covered by this arbitration agreement, and such claims may be presented to the appropriate court or government agency.

(f)    Notwithstanding this agreement to arbitrate, neither party waives the right to seek through judicial process, preliminary injunctive relief to preserve the status quo or prevent irreparable injury before the matter can be heard in arbitration.

(g)     The arbitrator shall issue a written arbitration decision stating the arbitrator's essential findings and conclusions upon which any award is based.  A party's right for review of the decision is limited to grounds provided under applicable law.

(h)     The parties agree that the arbitration shall be final and binding and any arbitration award shall be enforceable in any court having jurisdiction to enforce this arbitration agreement.

2.     BY AGREEING TO THIS BINDING ARBITRATION PROVISION, BOTH THE COMPANY AND I GIVE UP ALL RIGHTS TO TRIAL BY JURY, EXCEPT AS EXPRESSLY PROVIDED HEREIN.

3.     I agree that this agreement to arbitrate shall survive the termination of my employment.

4.     This is the complete agreement between me and the Company on the subject of arbitration of disputes.  This agreement supersedes any prior or contemporaneous oral or written understanding on the subject.  This agreement cannot be changed unless in writing, signed by me and the President or Chief Executive Officer of the Company.

AGREED TO AND ACCEPTED:

Dated: __12/18/2019__

_Jennifer Crumley_
98E46CE1C97740B...
_____
(Signature)

Jennifer Crumley
_____
(Print Employee Full Name)

Dated: _____

SecurityScorecard, Inc.

By :

_____

Name: Aleksandr Yampolskiy

Title: CEO

# EXHIBIT 3

Exhibit 3
Page 051

**SecurityScorecard**

**Variable Compensation Plan - FY 2023 - 021023**

<u>**Purpose**</u>
This Variable Compensation Plan ("Plan") establishes the criteria under which certain eligible employees (each, a "Participant") of SecurityScorecard, Inc. and its subsidiaries (collectively, the "Company") will receive variable compensation for attainment of their performance goals ("Variable Compensation"). This Plan supersedes all previous variable compensation plans, policies, or programs.

For details on a specific Participant's variable compensation structure, please refer to the Participant's signed Schedule A - Participant Variable Compensation Plan ("Comp Plan"). This Plan along with your individualized Comp Plan constitute the entire agreement with respect to the Participant's variable compensation (the "Agreement").

<u>**Effective Dates**</u>
This Plan is effective from January 1, 2023 to December 31, 2023.

<u>**Eligibility & Payout**</u>
To be eligible for participation in the Plan, a Participant must submit a signed Plan and Comp Plan to the Company. Variable Compensation must qualify as "Earned Variable Compensation" as defined below to be paid out.

Further, to be eligible for payout, the Participant must be an active employee of the Company on the date the Booking qualifies as Earned Variable Compensation (per the stated criteria in the definition of "Earned Variable Compensation")[1]. If a Participant's employment ends for any reason before all of the Earned Variable Compensation criteria are met, a Booking will not be considered Earned Variable Compensation and will not be paid. Further, after the final date of employment, a Participant will not be eligible to earn and will not earn any further Variable Compensation under this Plan; provided, for the avoidance of doubt that any Variable Compensation (i.e. Bookings) fully meeting the definition of Earned Variable Compensation before the date of termination/exit will be considered Earned Variable Compensation payable to Participant after such date of departure from the Company. However, if a Participant leaves the Company for any reason, the Participant is not eligible for any Variable Compensation incentives triggered after the last date of employment to the extent permitted by law (e.g., quarterly SPIFFS).

For Participants located outside of the United States, payment will be made in local currency. The Company will use Oanda[2] as its currency converter of record, and will adjust foreign exchange rates each quarter, using the rate on the close of business on the first day of the quarter.

<u>**Administration**</u>
The Plan will be administered by the Finance Team. The CFO and CRO will be ultimately responsible for final decisions involving the Plan and any payouts under the Plan.

In administering the plan, the Company applies the following principles, consistent with the definitions set forth below:
1.  Data source - Salesforce will be the system of record for all data related to performance goals unless otherwise specified in Participant's Comp Plan. In other words, in measuring attainment towards performance goals, only the sales made and recorded in Salesforce will be considered for Variable Compensation. Only those contracts and/or other sales

---

[1] For purposes of the Plan, employees on garden leave or working during a notice period will be deemed "active" and qualified to continue earning Variable Compensation until the last date of employment.
[2] https://www1.oanda.com/currency/converter/

Exhibit 3
Page 052

DocuSign Envelope ID: 43041577-F77A-410C-8CA9-95730A05281A

agreements that are in accord with Company forms and practices will be recorded in Salesforce and will be considered for Variable Compensation.

2. Payment - the Company will make reasonable efforts to pay Variable Compensation by the last day of the month following the month in which it is Earned. Please see Participant's Comp Plan for payout frequency period.

3. Overpayment - if a Participant is overpaid Variable Compensation, including, but not limited to, circumstances where the Participant is paid Variable Compensation before it is earned or based on an Unapproved Deal as defined herein, the Participant is obligated to repay the Company. The overpayment is a liability of the Participant to the Company until it is fully repaid or offset by future Variable Compensation.

4. Unpaid receivables - Variable Compensation is considered to be a recoverable draw and is not considered Earned Variable Compensation unless and until the invoiced amount is collected from the customer. Any invoiced amounts that remain unpaid after one hundred and twenty (120) days from the invoice due date will be adjusted from future Variable Compensation payments until the invoice is paid.

### Ethical Behavior

The Participant agrees that he/she will not engage in illegal conduct or misconduct which is materially and demonstrably harmful to the interests of the Company. Any such conduct, or willful attempt to commit an act of fraud or other similar act of criminal misconduct, significant dishonesty, including breaches of ethics or other immoral conduct which reflects adversely upon the reputation or interests of the Company may result in disciplinary action up to and including termination of employment and forfeiture of commissions.

### Right to Modify/Change Plan

The Company reserves the right to unilaterally amend the Plan and individual Comp Plan at any time to reflect new incentive situations, changes in marketing emphasis, increase in incentive targets or other conditions. The Participant will be notified of any changes to the Plan or Comp Plan in writing (which includes email) from the CFO (or the CFO's designee).

The Company reserves the right to interpret and apply the terms of the Plan and Comp Plan at its sole and absolute discretion. All issues or disputes relating to the Plan or Comp Plan or concerning the meaning and application of the Plan or Comp Plan shall be submitted in writing to the Finance Team, whose written response shall be final and binding.

### Entire Statement

Both parties agree that this Agreement is the complete and exclusive agreement between the parties relating to this subject matter. This Agreement shall be binding upon, and inure to the benefit of, the successors and assigns of the parties. If any provision of this Agreement is found to be invalid or unenforceable, the provision shall be deemed deleted or modified, only to the extent necessary to render it valid, enforceable and consistent with the original intent of the parties. The failure of a party to require performance of any obligations under this Agreement shall not be deemed a waiver and shall not affect its right to enforce any provision of this Agreement at a subsequent time. This Agreement supersedes all prior communications, oral or written concerning this subject matter.

### No Employment Agreement

This Plan is not to be construed in any way to be any form of employment agreement and in no way guarantees the employment of any Participant for any period of time or limits the right of Company to terminate the employment of a Participant in the Plan at any time, with or without cause. Nothing herein changes the at-will nature of Participants' employment providing either party the right to terminate the employment relationship at any time. The employment terms and conditions of international Participants continue to be governed by the Participants' employment agreements.

Exhibit 3
Page 053

## Governing Law
This Agreement is governed by the laws of the State of New York, excluding choice of law principles, unless otherwise required by applicable law. Venue shall be New York, NY. Your participation in this Agreement signifies your agreement with all the terms and conditions of the Agreement. In the event this Section is deemed not enforceable by a court of competent jurisdiction in the country in which you reside, the other provisions of this Agreement shall remain in full force and effect.

## Deal Desk Approval
**All terms must be approved by Deal Desk before presenting the terms to Customer.**

## Undocumented or Improperly Documented Deals
Deals that have an implicit or explicit term that is not approved by the Deal Desk ("Unapproved Deal") are prohibited. These Unapproved Deals will not retire any portion of a Participant's quota and will not be considered Earned Variable Compensation. In the event a Participant inadvertently received credit against quota and compensation under the Agreement for an Unapproved Deal, such payment shall offset future Earned Variable Compensation or be repaid to the Company ("Debooking" as defined below). This Debooking will affect all individuals who would otherwise have received credit for the deal (e.g. Sales Management, Solution Architects, etc.). In addition, the Participant may be subject to discipline up to and including, termination of employment.

## Conditional PO's & Termination for Convenience (opt out)
Deals generally should not contain Termination for Convenience, cancellation right or other opt out language. In the event of a Termination for Convenience, cancellation right or opt clause approved by Deal Desk, compensation credit will be deferred until the condition period is passed.

All conditional PO's are subject to Rev Ops review.  Debookings will be processed if a customer executes a conditional PO or payment is stopped. A Multi-Year Booking with an opt out for future years will be treated as a single year booking.

## Delayed Service Start Dates
In the event of an approved delayed service start date for New ARR is >30 days from deal execution, Revenue Operations reserves the right to defer Earned Variable Compensation  payment until license start date occurs.

## Windfall Policy (Exceptional Deals)
An "Exceptional Deal" is any single deal whose ARR bookings value exceeds 1.5x the sellers annual quota assignment.

The Company reserves the right to review commissions paid to the Participant on a deal-by-deal basis for Exceptional deals/windfall situations to the extent permitted by applicable law.

In all such instances, the Company will strive to be fair to the Participant while protecting the Company from unjustifiable commission and bonus expense. All such decisions by the Company shall be final and binding on Participants.

Participants are expected to contact the Revenue Operations team to discuss the compensation impacts of an Exceptional Deal before contract signing.

## Reciprocation of Services
Reciprocation of Services deals are defined as deals involving In-Flow of Revenue and Out-Flow of expense specifically targeted to secure business between the Company and customers/partners. Reciprocation of Services deals must be identified by the Sales Management team for Executive (C-Suite) level approval.   Commissions and Quota credit calculations for Reciprocation of Services deals are subject to executive level approval.

Exhibit 3
Page 054

**Acceleration Eligibility**

Plan Participants are eligible for an accelerator (as defined below) if they (1) achieve greater than 100% of assigned plan and (2) meet any accelerator qualifier requirements (e.g. achieve 85% of Renewal ARR target).

Accelerators will be paid up to 300% attainment which will be paid at the acceleration rate indicated in the Participant's Schedule A. Attainment greater than 300% will be paid at the standard base individual commission rate (ICR) for the given measure.

**Definitions and Conditions**

Below are definitions of the primary terms used in this Variable Compensation Plan and individual Participants' Comp Plans. Not all terms below may appear in or be applicable to every Participant's Plan

"**Accelerator**" - a multiplier that increases payment for achievement over percentage specified in Comp Plan

"**Achievement**" - Participant's progress towards meeting the performance goals specified in their Variable Compensation Plan. It is expressed as a percentage based on actual results/specified goal

"**Annual recurring revenue**" ("**ARR**") - the dollar value of a recurring Booking over a one-year term that is payable to the Company net of all fees, discounts, and taxes.

"**Attainment**" - see Achievement

"**Booking**" - a contract accepted by the Company and the customer for the usage of Company services as defined by the following criteria:

  a. Valid End User SaaS Agreement (signed or accepted digitally) or other similar legal agreement outlining the terms of the Company's service to Customer and Customer's purchase thereof.
  b. A Customer or Reseller Purchase Order (or Purchase Order Exception letter signed and dated by the customer's finance group). Purchase Order details must tie to signed Service Agreement/Order. A signed quote cannot be used in replacement.
  c. The Booking will be marked closed-won in Salesforce on the date all required documentation is received and accepted by the Company.
  d. The Booking does not contain any opt out clause, termination for convenience or other cancellation right requiring a refund
      a. A Multi-Year Booking with an opt out for future years will be treated as a single year booking
      b. Any order with a right to refund will not be considered a Booking until such period has ended and there are no contingencies on collected amounts
      c. Any order with a contingency dependent on another event (such as an agreement between a reseller and end customer) will not be considered a Booking until the contingency has expired.
  e. Note: A signed quote cannot be used in replacement of a Purchase Order, unless the deal does not require one
  f. Note: Payout timing for material contracts is subject to management review and discretion

"**Booking Date**" - the date a Booking is marked closed-won in Salesforce, unless the Booking contains an opt-out clause, termination for convenience or other cancellation right requiring a refund (see "Booking" (d)), in which case the Booking Date is the date on which the Booking becomes non-cancellable and non-terminable by the Customer.

"**Committed Multi-Year**" - means a Multi-Year Booking where the sales order has a subscription term of more than one year, but the client is only prepaying for one year upfront and the sales order does not permit the customer to seek a pro-rated refund or otherwise cancel the order without cause

Exhibit 3
Page 055

**"Customer"** - an entity that the Company has made a sale, licensed, or otherwise authorized usage of Company services to, either directly or through a reseller

**"Debooking"** - A debooking occurs when a Booking is reversed either in part or in full due to customer non-payment, return, or default of contract. All Debookings will be applied to commission earnings, payments, and quota attainments. Any commission already paid to a Participant related to the un-collected amount shall be offset (recovered) against future commission earnings and payments. If a Participant leaves the company before the debooking occurs but after the next commission payout cycle, the Participant will be asked to reimburse SecurityScorecard via check for the recoverable commissions.

**"Earned Variable Compensation"** – Variable Compensation only becomes Earned Variable Compensation, if the following criteria are satisfied:

- Participant's compliance, in the Company's sole discretion, with good faith business practices and the Participant has not acted in bad faith, committed or aided in an unethical business practice, or otherwise entered into a transaction on terms and conditions that are unfavorable or not profitable to the Company, including, but not limited to, a transaction that will cost the Company more than it could possibly receive and/or a transaction with no contractual refund provision.
- Participant's compliance, in the Company's sole and absolute discretion, with all laws and regulations applicable to your employment and all Company policies and procedures;
- The Company's receipt of a booked contract as defined in the definition of a "Booking" above.
- The Company has reconciled any commission paid to the Participant prior to the final determination of the Earned Commission.

**"End User"** - see Customer

**"Fulfillment"** - means that the reseller is only processing an order and has not been involved in the opportunity from a deal registration or teaming perspective.

**"Individual Commission Rate" ("ICR")** - specifies the variable percentage rate a Participant is eligible to earn for each dollar of ARR the Participant successfully books. Expressed as a percentage based on variable divided by quota

**"Multi-Year Booking"** - a recurring subscription with a term longer than one year

**"New ARR"** - the dollar value of a recurring Booking over a one-year subscription term that is payable to the Company net of all fees, taxes, and discounts for the first year of the subscription

**"Non-recurring revenue" ("NRR")** - the dollar value of a one-time Booking, such as paid proof of concepts ("POC") or one-time reports, that is payable to the Company net of all fees, taxes, and discounts

**"Participant"** - the individual named in the Comp Plan

**"Participant Variable Compensation Plan"** ("Comp Plan") - the document that specifies the performance goals, such as Quota, a Participant needs to achieve in order to earn "Participant Variable Compensation Plan", their TTI along with applicable Accelerators or Decelerators and other information specific to each individual Participant

**"Pipeline"** - the value of new ARR opportunities stage 1+, for deals not closed or parked, at point of creation along with applicable Accelerators or Decelerators and other information specific to each individual Participant Comp Plan

Exhibit 3
Page 056

"**Prepaid Multi-Year**" - means a Booking where the sales order has a subscription term of more than one year and the customer prepays for the full term upfront and the sales order does not permit the customer to seek a pro-rated refund or otherwise cancel the order without cause

"**Quota**" - the ARR goal a Participant is required to achieve to earn the variable compensation specified in their Comp Plan for the aforementioned goal

"**Ramped Quota**" - an employee is considered part of a ramped quota for the first 90 days of employment, unless otherwise documented in the Participants Compensation Plan. Participants on a ramped quota are not eligible for any multipliers as specified in their individual Schedule A when operating in a ramped capacity.

"**Registered Account (Deal registration)**" - a potential customer registered with SecurityScorecard by a Reseller that has met the following criteria:
  a. Reseller has personally met with an executive of the potential client who has the authority to authorize the purchase of Company products.
  b. A member of the Company's sales or channel team must verify or attend a meeting scheduled by the Reseller with a prospective customer
  c. The opportunity must be registered by the Reseller in the partner portal or the Reseller is the first company that secures a meeting with the prospective customer
  d. The opportunity is not already 'in motion' sourced by SecurityScorecard

"**Renewal ARR**" - the dollar value of a recurring Booking over a one-year subscription term that is payable to the Company net of all fees, taxes, and discounts for the second year of the subscription

"**Reseller**" - a third party that the Company has a signed agreement with to offer value-added services to prospective customers

"**SPIFF**" – an additional bonus for a Booking that may change each quarter depending on the Company's objectives as announced by the CFO

"**Targeted Total Incentive**" ("**TTI**") - the targeted amount of Variable Compensation plus Base Salary, that a Participant is eligible to earn upon meeting specific performance goals

"**Teaming Agreement**" - means that an opportunity where the Company has brought a Reseller into the opportunity based on the Reseller bringing significant value to the opportunity as determined by the Company

"**Total Contract Value**" ("**TCV**") **-** the dollar value of a Booking over its entire subscription term that is payable to the Company net of all fees, discounts, and taxes.

"**Upsell ARR**" **-** the dollar value of a recurring Booking over a one-year subscription term that is payable to the Company net of all fees, taxes, and discounts for either an existing Customer beyond the Renewal ARR amount, or to a new division of an existing Customer. An existing Customer must have had an active subscription within the last 6 months.

"**Variable Compensation**" – additional compensation, above Base Salary, that a Participant is eligible to earn based upon Bookings recording in the Salesforce system.

DocuSigned by:

Signature: _Sen Crumley_

0673810AC5704D6...

Date: March 22, 2023

Exhibit 3
Page 057

![Security Scorecard logo] Security Scorecard

### Schedule A - Participant Variable Compensation Plan

| | |
|---|---|
| Employee Name | Crumley, Jennifer |
| EEID | 446 |
| Sales Department | Field Sales |
| Team | West |
| Sub-Team | Ent SCal, NV & HI |

| | | | |
|---|---|---|---|
| Variable Comp (Local) | $ | 150,000.00 | |
| FX as of 01/01/2023* | | 1.0000 | USD |
| Variable Comp (USD) | $ | 150,000.00 | |

*Currency will be evaluated at the beginning of each quarter

**Effective Date: 01/01/2023 - 12/31/2023**

Payout Frequency Period: Monthly, to be paid on the last day of the month following the period in which it became Earned Variable Compensation

| | Quota Split | Quota | Potential FY Earnings | ICR |
|---|---|---|---|---|
| New ARR | 75% | $1,300,000 | 112,500 | 8.65% |
| Renewal ARR (90% of Pool)* | 15% | $940,187 | 22,500 | 2.39% |
| Professional Services NRR | 10% | $130,000 | 15,000 | 11.54% |

*Renewal pools subject to change quarterly, which may impact ICR.

| New ARR | Q1 | Q2 | Q3 | Q4 | FY |
|---|---|---|---|---|---|
| Quota | $221,078 | $287,144 | $372,762 | $419,016 | $1,300,000 |
| Earnings @ 100% | $19,132 | $24,849 | $32,258 | $36,261 | $112,500 |

| Renewal ARR (90% of Pool)* | Q1 | Q2 | Q3 | Q4 | FY |
|---|---|---|---|---|---|
| Quota* | $346,750 | $250,592 | $104,425 | $238,419 | $940,187 |
| Earnings @ 100% | $8,298 | $5,997 | $2,499 | $5,706 | $22,500 |

*Renewal pools subject to change quarterly, which may impact ICR.

| Professional Services NRR | Q1 | Q2 | Q3 | Q4 | FY |
|---|---|---|---|---|---|
| Quota (% of New ARR Quota) | 10.0% | 10.0% | 10.0% | 10.0% | |
| Quota | $22,108 | $28,714 | $37,276 | $41,902 | $130,000 |
| Earnings @ 100% | $2,551 | $3,313 | $4,301 | $4,835 | $15,000 |

| Accelerators | |
|---|---|
| Achievement % Range: | ICR Multiplier: |
| x>=0%, x<=100% | 1x |
| x>100%, x<=120% | 1.25x of amount over quota |
| x>120%, x<=150% | 1.5x of amount over quota |
| x> 150% | 2x of amount over quota |
| x> 300% | 1x of amount over 300% of quota |

Must achieve 85% attainment of Renewal ARR Pool to be eligible for all accelerators.
Renewal pools subject to change quarterly, which may impact ICR.

| Multi-year Bounty (New ARR & Renewal ARR) | | |
|---|---|---|
| Tiers: | Prepaid Customer Billing Bounty: | Other Billing Bounty: |
| < $Minimum Deal ARR* | 2.5% | 1.25% |
| $Minimum Deal ARR* to $100k | 5% | 2.5% |
| $100k+ | 10% | 5% |

Bounty is calculated as a percent of out years for New ARR and Renewal ARR
Minimum 50% attainment for New ARR or Renewal ARR is required to receive Multi-year Bounty commissions.
Must be an employee at the time of payment to be eligible for Multi-year Bounty commissions.

| Minimum Deal ARR by Segment (New Logo ARR only) | |
|---|---|
| Enterprise // Strategic // Alliances | $35,000 |
| International // Public // Mid-market // Insurance | $25,000 |

Deals sold for less than the Minimum Deal ARR (MDA) will paid out at 60% of the sold ARR value. Example: Enterprise deal sold for $30k paid as if it was booked as $18k in New ARR for commission purposes. Quota is retired at full ARR value of the deal.

Notes: Please refer to SSC Variable Compensation Plan for definitions of terms and calculations examples of compensation mentioned in this plan
* Non-Recurring Revenue measures are ineligible for accelerators.
* Individuals on a ramped quota are ineligible for accelerators.

DocuSigned by:

Signature: [signature: Jen Crumley]
90716T0ACE704D6...

Date: March 22, 2023

Exhibit 3
Page 058